In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2787

MATTHEW DYKEMA,

Plaintiff-Appellee,

v.

MICHAEL SKOUMAL,

Defendant-Appellant.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 98-C-5309--James F. Holderman, Judge.

ARGUED April 18, 2001--DECIDED August 17, 2001


   Before HARLINGTON WOOD, JR., DIANE P. WOOD,
and WILLIAMS, Circuit Judges.

   HARLINGTON WOOD, JR., Circuit Judge.  This
story grows out of an unsuccessful drug-
related transaction in which the
plaintiff, Matthew Dykema, a paid
informant working with the Metropolitan
Area Narcotics Squad ("MANS"), an
interjurisdictional law enforcement group
in the Joliet, Illinois area, was shot in
the head and seriously wounded by Stephen
Stepney in October 1997. Stepney claimed
unsuccessfully at his criminal trial, in
which he was convicted of the shooting,
that he shot Dykema in self defense.
Stepney claimed that he did not even know
Dykema, but recognized him only as
someone he had previously seen in the
area where he himself was looking for
drugs.

   Subsequently, Dykema brought this action
for damages pursuant to 42 U.S.C. sec.
1983 against Michael Skoumal, a former
Joliet police officer working with MANS,
and against other MANS personnel, as well
as the City of Joliet, and MANS. After
dismissals and settlements and an adverse
summary judgment ruling by the district
court, Skoumal is the only defendant
remaining in this appeal.

I.  Background

   The background facts are taken largely

from what Dykema has alleged or argued, or facts not otherwise contested (although in some instances disputed by Skoumal). The material facts upon which this case turns are as accepted by Skoumal or as found by the district court and, therefore, for this appeal not contested. Dykema, a resident of Mokena, a town southwest of Chicago near Joliet, Illinois, had a suspended driver's license and made inquiries to the police about reinstatement of the license. Dykema met with officers at the Mokena police station and discussed how he could assist the police in drug investigations. Dykema agreed to help, induced by the officers' promise to facilitate the return of his driver's license. He went to work for MANS using an alias assigned by the police. Dykema signed a confidential service document in which he admitted he was working as an informant under his own free will and not as a result of intimidation or threats.

Skoumal, a Joliet police officer working for MANS, functioned as Dykema's control officer. Craig Meece, a deputy sheriff, was the undercover officer with whom Dykema most often worked in making drug buys for MANS. Dykema assisted in a number of undercover investigations and prosecutions of drug-related offenses from the fall of 1996 through the spring of 1997.

Dykema argues that in this hazardous drug business he received no training from MANS on how to serve as a confidential informant, how to set up drug deals, or how to in-teract with drug dealers, etc. However, in his deposition Dykema elaborated on the training issues and turned the tables on the police. He stated that because of his long experience with drug transactions, he needed no training from the police. He stated that "[the police] are the ones that need [training]." In mid-1997, Dykema voluntarily entered a drug and alcohol rehabilitation program. After his discharge he told Skoumal and Meece that he no longer wanted to assist them. Although the police deny this, Dykema stated that after repeated entreaties by police, assisted by cash payments and beer, he agreed to resume his undercover work.

With that background, we approach the

particular circumstances giving rise to the critical facts in question. A suspected drug dealer named Jonathan Dantzler was a MANS target. Dykema and Meece, who posed as Dykema's brother on several occasions in September 1997, purchased crack cocaine from Dantzler, although no arrest was made. In order to build a better case against Dantzler, Skoumal and Meece planned a "reverse buy." Instead of buying drugs from Dantzler, Dykema and Meece would attempt to sell drugs to him, then Dantzler would be arrested. Drug transactions generally are considered dangerous, but it is claimed that a reverse buy poses even greater dangers. The reverse buy was first attempted on October 21, 1996, with Dykema wearing a wire, but it fell through when Dantzler, now buying instead of selling, wanted to first inspect the drugs before parting with his money. Dantzler drove out of the parking lot and MANS agents left to follow him. Stephen Stepney, Dantzler's cousin, was reportedly acting as protection for Dantzler. This occurred a week before Stepney shot Dykema. On October 28, Meece attempted to complete the reverse buy without Dykema, but this failed because Dantzler refused to deal without Dykema being present.

On the afternoon of October 29, the day the MANS agents had planned to again attempt the reverse buy, Dykema was arrested after an incident in a tavern. He was taken to the Lockport, Illinois police station and charged. Skoumal, Meece, and another agent, none of them in uniform, arrived at the station, and Dykema was released into their custody. The four walked down the main street of Lockport, and Meece and Dykema then went on to the bar where Dykema had earlier been arrested in order to pick up Dykema's truck. Meece and Dykema then left the bar and drove a few blocks to Dykema's apartment. There Dykema had an argument with his landlord, who proceeded to evict him and his belongings. Skoumal and the other agent had gone to wait for Dykema at the parking lot of a laundromat located across the street from Dykema's apartment. Skoumal and the other officer had been joined by two other agents, with all four observing the argument taking place at Dykema's apartment. Dykema and Meece then joined Skoumal and the other three agents in the parking lot across

the street. At no time during these events were any of the agents in uniform or in marked cars.

Meece did not want to work with Dykema that day be-cause Dykema had been drinking, so he decided the reverse buy attempt would not take place. A little later Dykema was driving to a restaurant when Skoumal and another agent waived him to the side of the road. Skoumal gave Dykema $20.00 to buy cocaine from Dantzler. He told Dykema to "smooth things over" with Dantzler and to tell Dantzler they still wanted to do business with him but at some other time. Dykema went on to the restaurant and began trying to contact Dantzler, but with no success. He first drove by Dantzler's home, then to where he knew a good friend of Dantzler's worked, but had no success in locating Dantzler. Dykema tried unsuccessfully to "beep" Dantzler, and then drove back to Dantzler's house at around 6:00 p.m. Suddenly, Dykema was shot in the head. Later, he could not remember any of the details. However, at his deposition, Dykema said that he later realized he had seen Stepney (the shooter) sitting in a car several cars away from Dykema at the time of the first unsuccessful reverse buy. As to whether Dykema had seen Stepney at any other time, his answer was, "possibly could have." Dykema said he had not expected to see Stepney at Dantzler's house. At his criminal trial, Stepney testified he did not know Dykema and recognized him only as someone he had previously seen in the area trying to buy drugs. This recital of the facts gives us a sufficient basis to consider the legal issues.

II. Analysis

We must first address Dykema's claim that this court has no jurisdiction before analyzing the merits of appellant's arguments. Dykema maintains that this is an interlocutory appeal since Skoumal's claim of qualified immunity was denied by the district court on a motion for summary judgment because the court found that there were disputed issues of material fact. See Johnson v. Jones, 515 U.S. 304, 313-18 (1995) (holding that a defendant, entitled to invoke a qualified immunity defense, may not appeal a summary judgment order when that order determines there is a

"genuine" issue of material fact for trial). However, Skoumal has conceded Dykema's version of the facts and challenges only whether those conceded facts establish a violation of clearly established law. See Coady v. Steil, 187 F.3d 727, 730 (7th Cir. 1999) (citing Behrens v. Pelletier, 516 U.S. 299, 313 (1996)).

In reviewing the propriety of a district court summary judgment ruling under Fed.R.Civ.P. 56, we review de novo and adhere to the same standards as the district court set forth in its memorandum opinion and order under Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1996). See American Postal Workers Union v. Runyon, 185 F.3d 832, 835 (7th Cir. 1999). In Anderson, the Court held that at the summary judgment stage, the district court's function is not to weigh the evidence or determine the truth of the matter. 477 U.S. at 249. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. However, even though there may be material facts in dispute, we review the order of summary judgment by accepting the district court's determination that a genuine issue of material fact exists. Coady, 187 F.3d at 730-31. Skoumal does not quarrel with that rule, and for the purpose of this appeal concedes the critical factual dispute which caused the district court to deny his motion for summary judgment. It is necessary, therefore, to determine both the question of this court's jurisdiction and what effect as a matter of law the material facts as found by the district court may have on the summary judgment ruling.

Skoumal raises two issues aside from the jurisdictional question raised by Dykema. First, Skoumal claims that his conduct did not violate Dykema's substantive due process rights, notwithstanding the fact that the district court held that Skoumal's affirmative action placed Dykema in a position of danger that he otherwise would not have faced, and which resulted in Dykema being shot by Stepney. Secondly, Skoumal maintains that he is entitled to qualified immunity even though the district court found that at the time of the shooting Dykema had a due process right not to be placed in a position of increased danger created by

Skoumal. Our answer to these two issues disposes of the jurisdictional question as well.

A number of cases have been cited by the parties, including the cases relied on by the district court. We have considered them all, but not all are needed to resolve the issues. The district court determined that Dykema raised a genuine issue of material fact in his sec. 1983 claim on the basis that his constitutional rights were violated under the "state-created danger exception" which was developed in DeShaney v. Winnebago County Department of SocialServices, 489 U.S. 189 (1989). DeShaney held that the state had no constitutional duty to protect a child against his father's violent abuse. Id. at 202. In DeShaney, there was strong evidence of child abuse in the home, and on one occasion the child required emergency hospital care. Id. at 192. The county social services agency looked into the charge and the juvenile court as a result placed the child in the temporary custody of the hospital. A child protection team was assembled, ad hoc, which recommended certain measures to protect the child. The father voluntarily agreed to comply with the team's recommendations and the court returned the child to the father's custody. The caseworker made monthly visits for the next six months, each time noting suspicious injuries on the child and recording that none of the protective measures had been adopted. Id. at 192-93. Calls from emergency room physicians also continued, the last one made in November 1983. Id. The caseworker made two more visits but did nothing except to note that on both occasions she was told the boy was too ill to be seen. No other action was taken. Id. at 193. In March 1984, the father beat the four-year-old boy so severely that he suffered permanent brain damage and was expected to spend the rest of his life institutionalized. The father was subsequently convicted of child abuse, but that was too late to benefit the boy. Id.

DeShaney laid out the basic law concerning substantive due process claims, holding that due process forbids the state from depriving another of life, liberty, or property without due process

of law, but "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." Id. at 195. The purpose of due process is to protect people from the state, not to require the state to protect individuals from each other. Id. at 196. Nor is there a right to governmental aid, "even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." Id. An exception is made for state prisoners because prisoners have lost the freedom to act for themselves. Id. at 198. The Court rejected the argument that some "special relationship" created or assumed by the state might impose a duty to protect individuals arising from the interventions of the state social services agency. Id. at 197. The state's duty to protect does not arise from the state's knowledge of the person's problems, "but from the limitation which [the state] has imposed on [the individual's] freedom to act on his own behalf." Id. at 200.

In this present case, the district court relied on an exception which has developed from the language in DeShaney, which states that even though the state may have been aware of the abusive dangers the boy faced, "it played no part in their creation, nor did it do anything to render him any more vulnerable to them." Id. at 201. This circuit has taken advantage of that language to hold that state liability may exist if any state action "creates, or substantially contributes to the creation of a danger or renders citizens more vulnerable to a danger than they otherwise would have been." Reed v. Gardner, 986 F.2d 1122, 1126 (7th Cir. 1993). In Reed, the police officer defendants arrested the driver of a car,/1 but not the drunken passenger who was left in the car with the driver's car keys. The drunk passenger used the keys to drive away and crashed head on into the plaintiffs' car killing a pregnant woman and injuring five other passengers. Id. at 1123-24. Although the panel noted that "we have been hesitant to find sec. 1983 liability outside the custodial setting," it found that the officers in this case "initiated the state action and that the state intervention created the dangerous

condition, a drunk driver on the road."
Id.

In Monfils v. Taylor, 165 F.3d 511, 513 (7th Cir. 1998), we had another unique factual situation where an informant, Monfils, who was an employee in a paper plant, made a telephone call to the police informing them that another employee, Kutska, was going to steal plant property. Monfils insisted on anonymity because he knew Kutska had a reputation for violent behavior. Kutska subsequently was caught when he attempted the theft. He vowed to discover the informant's identity and requested a copy of the taped call from the police. Id. At the same time, Monfils made several calls trying to prevent the release of the recording and was assured each time that the tape would never be released. Nonetheless, one of the officers located the tape and released a copy to Kutska. Kutska recognized Monfils' voice as the informant and several hours later Monfils was murdered. Kutska and five other employees responsible for Monfils' death were convicted, and Monfils' survivors brought the sec. 1983 suit against the city and police department. Id. at 514-15. In resolving Monfils, we ratified our previous holding in Wallace v. Adkins, 115 F.3d 427 (7th Cir. 1997). In Wallace, we held that an order requiring a prison guard to remain at an especially dangerous post, while at the same time offering him false assurances that he would be protected, qualified as an affirmative act for purposes of the state-created danger claim. 115 F.3d at 430. The elements of the Wallace claim were: "What actions did the prison officials affirmatively take, and what dangers would Wallace otherwise have faced?" Monfils, 115 F.3d at 517./2

In this present case, however, we have a factual situation which cannot be squeezed into any DeShaney exception, or into the exceptions which have grown out of DeShaney. Creating another exception would risk undermining DeShaney. In any event, we have no factual basis from which to fashion an exception to fit this case.

Dykema was experienced in drug transactions, a business he knew to be dangerous. He claimed he knew how tooperate in drug matters better than the

police. He viewed himself as an instructor from whom the police could learn. He was a drug dealer of his own free will and was not forced into drug dealing by MANS. Dykema decided to cooperate with MANS as requested, but for reasons he perceived as for his own benefit--for cash, beer, and to get his driver's license back. He was not in police custody. Stepney, who shot Dykema, qualifies as a "private actor." Stepney was not a target of any MANS sting operation, and no evidence ties him to Dykema and the sting operation at issue. Dykema and Stepney both thought they might have noticed each other on some prior occasion, but were not known to each other. They were just two participants in the drug world operating on common drug turf. They appear to have been drug competitors. No drug transaction was contemplated on the day of the shooting because of Dykema's drinking. Although Skoumal advised Dykema to try to "smooth things over" with Dantzler, no one in MANS gave Dykema instructions as to how, whether in person or by phone, or when he should try to smooth things over with Dantzler. Nor were any time limitations imposed by MANS. The details were left to Dykema and his own judgment as an experienced drug operator. If he thought the situation was getting too dangerous, he could withdraw as he had before. At that time he had voluntarily resumed his undercover work. He knew how to quit. His relationship with MANS did not amount in any way or degree to his being in the custody of MANS. The injury to Dykema was unfortunate, but it is general knowledge that drug dealers are often armed to protect their drugs and money from competitors. MANS had nothing to do with the particular event of Stepney shooting Dykema. MANS was not aware that Dykema was in any danger from Stepney. MANS was not responsible for Dykema's injuries. Dykema assumed the drug dealing risks. The mere fact that Dykema was seen in the company of several law enforcement agents is immaterial. There is no evidence the agents were recognized as officers, or if they had been recognized, how that had anything to do with Stepney shooting Dykema. Mere speculation and argument cannot supply the factual basis for an exception to DeShaney. Nor has there been any assertion that MANS advised Dykema that they would protect him, nor did

Dykema ask for protection.

III.  Conclusion

Although the district court gave attention to the facts and the applicable precedents, we must disagree with the judgment which resulted. There was no material fact in dispute to defeat this court's review of the summary judgment, which in turn gives this court jurisdiction. The case is without merit under DeShaney and its progeny, and must be and is REVERSED. As nothing further is required for the district court, the case is hereby DISMISSED. The parties shall bear their own costs.

REVERSED AND DISMISSED.

FOOTNOTES

/1 The record suggests the driver was also drunk. See Reed, 986 F.2d at 1124.

/2 The other cases cited to us, all with varying factual situations, need not be pursued. See Roviaro v. United States, 353 U.S. 53 (1957); Stevens v. Umsted, 131 F.3d 697 (7th Cir. 1997); Losinski v. County of Trempealeau, 946 F.2d 544 (7th Cir. 1991); Gibson v. City of Chicago, 910 F.2d 1510 (7th Cir. 1990); Archie v. City of Racine, 847 F.2d 1211 (7th Cir. 1988) (en banc); Bowers v. DeVito, 686 F.2d 616 (7th Cir. 1982); White v. Rockford, 592 F.2d 381 (7th Cir. 1979).