# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 01-3318

EDWARD M. LEWIS, *et al.*,

*Plaintiffs-Appellants*,

v.

ELOISE ANDERSON, *et al.*,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 01 C 56—**John C. Shabaz**, *Judge.*

———————

ARGUED APRIL 1, 2002—DECIDED OCTOBER 21, 2002

———————

Before EASTERBROOK, DIANE P. WOOD, and EVANS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.*  This suit is about a foster care placement, and later adoption, that failed, because the host family (and later parents) turned out to be abusive. The plaintiffs are five of six siblings who were placed with the family. They have sued several officials of the Wisconsin Department of Health and Social Services (DHSS) in their individual capacities under 42 U.S.C. § 1983, alleging that the defendants violated their Fifth and Fourteenth Amendment due process rights when they entrusted them to this family. On cross motions for summary judgment, the district court ruled for the defendants, holding that the plaintiffs could not show that the state

knew or suspected that the foster parents were probable child abusers, and that such a showing was necessary for liability. The court dismissed some supplemental state claims without prejudice. While we are sympathetic to the unfortunate history of these individuals, we agree with the district court that the defendants violated no legal duty to the plaintiffs, and we therefore affirm.

**I**

The plaintiffs, Edward Max Lewis, Matthew S. Lewis, Michael G. Lewis, T.L., and O.L., all siblings, were minors at the time of the relevant events. Defendant Eloise Anderson was the Administrator of the Division of Community Services at DHSS. Defendants Sandra Stolle and April Lancour were social workers for DHSS; they were supervised by defendant Shirley Bohle.

In 1987, Derwin and Rebecca Lewis were the heads of a family that included one biological child and one foster child. In 1988 the couple adopted three "special needs" children. Later, the Lewises were considering adopting more children, and so the state undertook a new study of their suitability, which was completed in 1989. In 1990, DHSS became the legal guardian of the five plaintiffs and their sister, and it began searching for adoptive placement for them. As the children were Native Americans, the Indian Child Welfare Act, 25 U.S.C. § 1901 *et seq.*, applied to them. A strong preference had been expressed for placement of all the children together—a situation regarded as less traumatic for adopted children.

During the investigation of the Lewis family, DHSS obtained reports from at least three outside sources vouching for the ability of the Lewises to adopt more children. All sources ultimately recommended the Lewises as suitable adoptive parents, even though one source expressed some reservations. Prior to the placement of the children with the Lewises, DHSS also learned that Derwin Lewis,

the father, had on one occasion hit one of his children. Derwin discussed the event with a social worker. This was the only instance of even arguable rough treatment that DHSS knew about before the events at issue here.

On May 31, 1990, the state terminated the parental rights of the children's biological parents and they became wards of the state. Shortly thereafter, in June and July 1990, they were placed in preadoptive foster care with the Lewises, largely because the Lewises were (like the children) Native Americans and they were willing to take all six children. This placement involved removing the children from other temporary foster homes where they were doing well. Furthermore, it left the Lewises with a family of two parents and 11 children ranging from ages 5 to 15; of the 11 children, nine had special needs, including emotional, physical, and behavioral problems. On April 23, 1991, the Lewises formally adopted all six siblings.

The second amended complaint focuses on the time period between the foster care placement (roughly mid-1990) and the formal adoption. The children allege that they were physically abused by the family. Later, after the adoption, these problems came to light and the children were removed from the Lewis household and placed with other foster families. The district court found that during the foster care period the defendants neither knew nor suspected that the children would be, or were being, abused by the Lewises.

## II

As an initial matter, we must consider whether this suit is barred by the *Rooker-Feldman* doctrine. See generally *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983) and *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). While neither party addressed this point in the original briefs, the panel raised it at oral argu-

ment and requested supplemental memoranda on the issue. The *Rooker-Feldman* doctrine is jurisdictional in nature, and thus it may be raised at any time for the parties and by the court *sua sponte*, see *4901 Corp. v. Town of Cicero*, 220 F.3d 522, 527 (7th Cir. 2000). Because of the jurisdictional nature of the doctrine, we must assure ourselves that it does not bar the suit before we turn to the merits. *Id.* See also *Garry v. Geils*, 82 F.3d 1362, 1364 (7th Cir. 1996).

*Rooker* and *Feldman* establish the fact that lower federal courts do not have jurisdiction to conduct direct review of state court decisions. *Rooker*, 263 U.S. at 416; *Feldman*, 460 U.S. at 482. Furthermore, the *Rooker-Feldman* principle extends to claims that are "inextricably intertwined with the state-court judgment [such that] the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 25 (1987) (Marshall, J., concurring); *Edwards v. Illinois Bd. of Admissions to the Bar*, 261 F.3d 723, 729 (7th Cir. 2001). The pivotal question, then, is "whether the injury alleged by the federal plaintiff resulted from the state court judgment itself or is distinct from that judgment." *Rizzo v. Sheahan*, 266 F.3d 705, 713 (7th Cir. 2001) (quotation marks and citation omitted). To put it another way, the key inquiry is "whether 'the district court is in essence being called upon to review the state-court decision.'" *Ritter v. Ross*, 992 F.2d 750, 754 (7th Cir. 1993), quoting *Feldman*, 460 U.S. at 483-84 n.16.

The plaintiffs contend that the *Rooker-Feldman* doctrine does not bar their claim because they are not challenging the final placement decision, but rather the shortcomings of the defendants in their evaluation of the suitability of the Lewis family for both interim and permanent placement. Labeling a suit as a § 1983 action alleging due process violations, however, does not automatically remove the bar to suit in federal court. See *Remer v. Bur-*

*lington Area Sch. Dist.*, 205 F.3d 990, 997 (7th Cir. 2000) ("A plaintiff may not circumvent the effect of the *Rooker-Feldman* doctrine simply by casting [his] complaint in the form of a federal civil rights action.") (quotation marks and citation omitted).

To the extent that the plaintiffs in this case contend that their constitutional rights were violated by the defendants during the pre-adoption period, they may proceed; to the extent that they challenge the decision to approve the Lewises as adoptive parents, they may not (as the latter decision was taken under the supervision of the state courts). The decision with respect to the pre-adoption period, however, was not taken pursuant to any court order, and thus the § 1983 suit cannot be the equivalent of an attempt to have a lower federal court review a state court judgment. As to that period, there is no state court judgment to review; there is only the course of action followed by the DHSS officials. No Wisconsin court has ever entertained a case touching upon the process whereby the state actors chose the Lewises as foster parents and monitored their performance in that capacity prior to the adoption. We conclude that DHSS's allegedly negligent placement of the children with the Lewises, as opposed to any other foster family, is not "inextricably intertwined" with the decision that the children ought to be placed with a family in the first place, and thus that there is no *Rooker-Feldman* bar to this action.

### III

This clears the way for us to proceed to the issues presented for review on this appeal. We review the district court's decision to grant summary judgment *de novo*, viewing all facts and drawing all inferences in favor of the non-moving party. *Weinberger v. State of Wisconsin*, 105 F.3d 1182, 1186 (7th Cir. 1997).

Although the underlying facts of this case portray a sad course of events, it is important to bear in mind that "the claim here is based on the Due Process Clause of the Fourteenth Amendment, which, as [the Supreme Court has] said many times, does not transform every tort committed by a state actor into a constitutional violation." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1988). *DeShaney* held that a state has no constitutional duty to protect a child against parental abuse. *Id.* Nevertheless, it also recognized an exception— on which the plaintiffs here rely—for cases where the danger to the child is "state-created." See *Dykema v. Skoumal*, 261 F.3d 701, 704-05 (7th Cir. 2001), citing *DeShaney*, 409 U.S. at 201. Despite the fact that a state has no positive duty under the federal Constitution to provide for the safety of its citizens, *DeShaney*, 489 U.S. at 195, the Due Process clause of the Fourteenth Amendment imposes such a duty where state action "creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger than they otherwise would have been." *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993). Alternatively, the state's duty may arise from the creation of a "special relationship" between the state and the individual. See, *e.g.*, *Nicini v. Morra*, 212 F.3d 798, 808 (3d Cir. 2000) (*en banc*).

This court has held, in the context of child placement by an adoption agency, that agency officials and case workers are liable only if they violated "the right of a child in state custody not to be handed over by state officers to a foster parent or other custodian, private or public, *whom the state knows or suspects to be a child abuser.* Only in this case thus narrowly described can the foster parents be fairly considered an instrument of the state for child abuse." *K.H. v. Morgan*, 914 F.2d 846, 852 (7th Cir. 1990) (emphasis in original). Negligence or even gross negligence does not suffice to give rise to liability under § 1983. *Id.* at 852, citing *Daniels v. Williams*, 474 U.S. 327, 328 (1986) and *Archie v. City of Racine*, 847 F.2d 1211, 1220 (7th Cir. 1988) (*en banc*).

The standard articulated in *K.H.* does not take the next step and impose some kind of duty of inquiry in these cases. If we are to follow *K.H.*, therefore, the DHSS officials cannot be held liable on the basis of facts they did not actually know or suspect, even if they might have learned about disqualifying information if they had conducted a more thorough inquiry. In order to survive summary judgment, the plaintiffs needed to put forth a case that the DHSS defendants actually knew of or suspected the existence of child abuse in the prospective adoptive family.

The plaintiffs have attempted to meet this stringent standard by arguing that there is at least a dispute of fact on the question whether the defendants knew or suspected that the children were likely to be abused or neglected in the Lewis home. They also assert that there is a dispute of fact on the question whether the defendants failed to exercise professional judgment. As a last resort, they also urge us to revisit the standard set forth in *K.H.*

Operating under the "knowledge or suspicion" standard, we of course review the facts in the light most favorable to the plaintiffs. The relevant time frame for our inquiry is between the time when the state became the guardian of the children and when it relinquished guardianship to the adopting family—that is, between May 31, 1990 and April 23, 1991—when the children were formally adopted. Once a child is placed with a foster family prior to adoption, the state's duty continues through the period of foster care, as the state at that point is still legally the children's guardian. See, *e.g.*, *Terry B. v. Gilkey*, 229 F.3d 680, 682 (8th Cir. 2000).

The main evidence that the plaintiffs put forth to satisfy the knowledge or suspicion requirement comes from two sources: first, the incident mentioned earlier when Derwin slapped a different child, and second, the contents of a reference letter from friends of the family, the Nelsons.

Stolle, one of the defendants, knew about the slapping incident: Derwin admitted that he once lost his temper and hit Daniel, one of the children that the Lewises had already adopted at the time the plaintiffs were being considered for foster placement. Even though evidence of even a single instance of abuse may constitute a circumstance sufficient to warrant immediate state action on a child's behalf, see, *e.g.*, *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 22 (1st Cir. 2001), that must be an instance of actual abuse. A single hitting of a child (without more evidence of the severity of the consequences than we have here) does not necessarily constitute child abuse; were that the case, nearly any practitioner or case worker who has ever witnessed a slapping of a child would be under a legal duty to report the occurrence to the designated agency—and every parent who ever slapped or spanked a child would face the possibility of losing custody of the child. See, *e.g.*, Wis. Stat. § 48.981(2) (making reporting of possible child abuse mandatory for designated persons). Many states have adopted a "not every bruise is an abuse" rule. See, *e.g.*, *Briggs v. State*, 752 N.E.2d 1206 (Ill. App. Ct. 2001) ("Beyond the regulation which states not every bruise amounts to abuse, the [Abused and Neglected Child Reporting Act] requires for a finding of abuse death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function, substantial risk of such injury, or corporal punishment which is excessive.") (quotations omitted). While one instance of child-hitting may raise a red flag, it does not immediately become a "suspicion" of child abuse.

Even if one known instance of slapping was not enough to raise a suspicion of an abusive environment for the DHSS officials, the plaintiffs also argue that this information did not stand alone. There was also a lukewarm reference letter in the file. Taken together, they argue, these two items should have done the job, in the sense that they would permit a trier of fact to find the neces-

sary knowledge or suspicion on the part of the defendants. We disagree. DHSS requires three letters of reference from non-relatives detailing the family's fitness for placements. Two of the references, given by the Curtises and the Genges, were unconditional in their endorsement of the Lewises. While the third reference, submitted by the Nelsons, was not unqualified, neither was it a negative report. To the contrary, the Nelsons concluded in their report that they believed the Lewis family was fit to adopt the children. They merely expressed a few concerns, such as their perceptions that the parents had short tempers and that the home might be too small for such a large number of children. The report also pointed to some "irritability" on the part of the mother related to her job and the fact that the parents "seem to have a little prejudice in some of the children." The Nelsons further wrote that "the [existing] children are still adjusting to find their place and we don't feel that their family is stable enough for more children yet."

Assuming that the DHSS officials credited every word of the Nelsons' report, this is still not enough to charge them with either knowledge or suspicion of child abuse. The Nelsons were asked to comment on "irritability, excessive drinking, use of narcotics, history of mental illness, [and] criminality." They mentioned only irritability in their response and qualified their comment with the statements about Rebecca's work demands. "Strict discipline," another factor the Nelsons included, is hardly direct evidence of likely child abuse. The plaintiffs claim that this should have alerted DHSS and its workers to the possibility of abuse. "Should have alerted," possibly (though we note that many people today bemoan the converse, loose discipline), but it is not sufficient to support a finding of knowledge or suspicion of abuse. In fact, no references to abuse or its possibility appear in the Nelson report. In response to the question "If you were responsible for a child's future, would you consider this individual/couple a good choice as a parent(s)?" the Nelsons

said "yes." While it might have been a good idea for the DHSS officials to have looked further into the Nelsons' potentially euphemistic references to strictness, discipline, and irritability, this is not the standard for § 1983 liability in the placement context under *K.H.*

Aside from the Nelson reference, the plaintiffs point to a statement by Rebecca, the mother, that she was "not too patient, moody." Rebecca further admitted that she came from a dysfunctional family and never really knew her father. The plaintiffs also rely on statements by therapists and psychologists that these six children should not be placed together because any foster parent would be quickly overwhelmed by the challenges they presented.

Even taken together and in the light most favorable to the plaintiffs, this evidence is insufficient to support a finding of knowledge or suspicion of impending child abuse on the part of any of the DHSS defendants. The question is not whether abuse was actually occurring or how bad it was; it is instead what degree of responsibility the law imposes on these state actors, and whether a lawsuit against them is a remedy for any abuse that was occurring. Much worse abuse of children has unfortunately taken place, but other courts have agreed with us that something like the *K.H.* standard governs whether any remedy lies against the state social workers. The Eighth Circuit had occasion to visit this issue *en banc* in *S.S. v. McMullen*, 225 F.3d 960 (8th Cir. 2000). In *S.S.*, the Eighth Circuit affirmed the dismissal of a § 1983 suit against several state actors for their placement of a child who was in state custody with her father. The father was known to associate with a convicted child molester who later sodomized the infant girl on at least two occasions. 225 F.3d at 962. The state actors were also in possession of a psychological evaluation of the father that described him as likely to endanger her welfare. The court concluded that even this degree of knowledge was insufficient to impose liability on the state actors. *Id.* at 963.

Thus, while the DHSS social workers may have been negligent in their background investigation of the prospective adoptive family, negligence is not enough to give rise to § 1983 liability. See *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). They were never alerted by anyone or anything to either actual abuse or the possibility that the Lewises would abuse these children while they were under the state's guardianship. If state actors are to be held liable for the abuse perpetrated by a screened foster parent, under *K.H.* the plaintiffs must present evidence that the state officials knew or suspected that abuse was occurring or likely. 914 F.2d at 852.

Lastly, we decline the plaintiffs' invitation to reconsider the standard set forth in *K.H.* That standard does not conflict with any decision of the Supreme Court or more recent decision from this court. See, *e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976) (setting forth the "deliberate indifference" standard); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (deliberate indifference requires knowing disregard of risk to safety); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) ("*Farmer* reaffirms the *Gamble* standard and stresses that the test for deliberate indifference is a subjective one: the prison official must act or fail to act 'despite his knowledge of a substantial risk of serious harm.'"). See also *White by White v. Chambliss*, 112 F.3d 731, 737 (4th Cir. 1997) (adopting *K.H.* standard); *Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 893 (10th Cir. 1992) (same). It is consistent with the approach taken by the Eighth Circuit, and it reflects the fact that liability should not be imposed lightly on state workers. (We note as well that even if we were inclined to reconsider *K.H.*, it would be virtually impossible to impose § 1983 liability on these particular defendants, because they would have an iron-clad defense of qualified immunity.)

## IV

We likewise find it unnecessary to reach any of the other contentions on this appeal, including in particular the argument that the caseworkers gave undue weight to the Lewises as prospective foster parents because of the Indian Child Welfare Act. In light of our decision to adhere to the *K.H.* standard, the question whether the caseworkers would have found a better family had they looked beyond the field of prospective Native American parents is not relevant. We AFFIRM the judgment of the district court.


A true Copy:

      Teste:


                _____
                *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*

USCA-02-C-0072—10-21-02