**JENNIFER Y., a Minor, by her Next Friend, Attorney and Guardian ad Litem, Robert F. Harris, the Cook County Public Guardian, Plaintiff,**

v.

**Carmen VELAZQUEZ, Licensing Supervisor, Illinois Department of Children and Family Services, Defendant.**

No. 00 C 5586.

United States District Court,
N.D. Illinois,
Eastern Division.

June 20, 2006.

Charles Perez Golbert, Patrick Thomas Murphy, Office of the Cook County Public Guardian, Jill P. Runk, Mark Elliot Weiss, Chicago, IL, for Plaintiff.

Barbara Lynn Greenspan, Attorney General's Office, James C. Stevens, Jr., Office of the Illinois Attorney General, Patrick Wayne Carlson, Meckler, Bulger & Tilson, Chicago, IL, for Defendant.

## OPINION AND ORDER

NORGLE, District Judge.

Before the court is Defendant's Motion for Summary Judgment, brought pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Motion is granted.

### I. BACKGROUND

#### A. The Parties

Plaintiff Jennifer Y. was born on December 13, 1996. At the time of her birth, Jennifer tested positive for cocaine and heroin. Jennifer also suffered from numerous other health problems at birth, including syphilis. On September 4, 1997, Jennifer was placed into the custody of the Illinois Department of Children and Family Services ("DCFS"), due to concerns regarding the ability of Jennifer's natural mother to properly care for her.

Patrick T. Murphy was the Public Guardian of Cook County at the time this

lawsuit was filed. Robert F. Harris presently holds that position. By orders of the Chief Judge of the Circuit Court of Cook County and the Presiding Judge of the Juvenile Court, the Public Guardian is appointed attorney and guardian *ad litem* for children who are subjects of abuse, neglect, and dependency petitions filed in the Juvenile Court, including Jennifer.

Defendant Carmen Velazquez ("Velazquez") was employed at all relevant times by DCFS as a Licensing Supervisor. Rosetta M. Smith ("Smith") was employed at all relevant times by DCFS as a Licensing Representative. Smith was a named Defendant in this case prior to her death on May 11, 2004. Both Defendants were sued in their individual capacities.

## B. Facts

On May 24, 1998, five month old Rayshawn P. was brought to the Loyola University Medical Center by his foster mother, Kaundra Buckner ("Buckner"). Rayshawn had been in Buckner's care since March 28, 1998. Buckner indicated to Loyola physicians that Rayshawn cried whenever his right foot was moved or touched, and that he could not bear weight on that foot. X-rays revealed that Rayshawn had suffered fractures to his right tibia and femur approximately ten to fourteen days earlier. Doctors determined that it was not possible for Rayshawn to have caused these injuries to himself, and that there was no medical attention sought for these injuries at the time they occurred. Buckner offered no explanation as to how Rayshawn might have sustained such fractures.

DCFS, through its Division of Child Protection ("DCP"), then began an investigation into whether Buckner had abused Rayshawn. DCP Investigator Victor Siemen ("Siemen") conducted the investigation. Siemen informed Smith that Rayshawn had suffered two leg fractures while in Buckner's care, and that Buckner had no explanation for these injuries. (Smith had already learned of Rayshawn's injuries after speaking with another foster parent at some earlier date, and had reported this information to her supervisor, Velazquez.) As a result of this investigation, DCFS worker Ronnie Anderson ("Anderson") placed a "hold" on Buckner's foster home license on June 10, 1998, which meant that no children could be placed in Buckner's home until the hold was lifted. Approximately one month later, Smith received a copy of Seimen's DCP investigation report, in which Buckner was "indicated" for abusing Rayshawn. The finding of "indicated" meant that Seimen had concluded that there was credible evidence to support the allegations of abuse against Buckner. None of this was brought to the attention of the Circuit Court of Cook County.

Pursuant to standard DCFS procedures, when a foster home license is put on hold due to an allegation of abuse, a DCFS licensing representative must conduct an investigation to determine whether the license should be revoked or modified in some manner. Normally, this investigation would take place following the conclusion of the separate DCP investigation. Smith was the licensing representative responsible for conducting this investigation. Smith contacted Buckner once by telephone in June 1998, and made a scheduled visit to Buckner's home in March 1999, but Buckner was not present. Smith reviewed Seimen's investigation report, but never conducted any other investigation into Buckner's fitness as a foster parent. On April 1, 1999, Smith took a leave of absence from her position at DCFS. In March 1999, Velazquez was promoted to the position of Resource Development Manager. In that position, Velazquez assumed responsibility for all the foster care

licensing that took place in her region, including licensing investigations.

Buckner then appealed the "indicated" findings against her, and requested an administrative hearing. During the administrative proceedings, Buckner's attorney filed a Motion for Summary Judgment, to which DCFS counsel responded. In his response, DCFS counsel stated as follows:

A preponderance of the evidence indicates that the minor [Rayshawn] sustained these fractures during the period when he was under the care of Kaundra Buckner. Ms. Buckner stated that the child appeared to be experiencing some problems with his right leg when he came into her care, but the evidence shows that this was not due to bone fractures, but a possible neurological deficit caused by the mother's cocaine use. The other persons who, at times, had care and control of the child report no indications of any injuries. Although the Department cannot produce evidence of any direct action taken by Kaundra Buckner which caused the child's injuries ... the preponderance of the circumstantial evidence, which is all of the evidence there is on that issue, indicates that Kaundra Buckner was responsible for the bone fractures suffered by Rayshawn.

Pl.'s Ex. 7. For reasons the record does not make clear, on February 22, 1999, counsel for DCFS then voluntarily "unfounded" the allegations against Buckner without a hearing, and expunged Buckner's record of the abuse allegations. An allegation of abuse is declared "unfounded" if there is no credible evidence to support the allegation.

Since the report of abuse had been "unfounded," and Buckner's record had been expunged of any allegations of abuse, Gloria Brown ("Brown"), another DCFS supervisor, recommended to Velazquez that the hold on Buckner's license be lifted.

Neither Brown nor Velazquez ever investigated why the report of abuse had been "unfounded." On May 24, 1999, Velazquez signed a document authorizing the lifting of the hold on Buckner's foster care license.

In June 1999, DCFS caseworker Michelle Williams ("Williams") was assigned to Jennifer Y. Williams contacted Adrienne Welenc ("Welenc"), lead foster parent advocate for Cook County, to obtain information about foster homes in the area. Welenc was aware of the fact that Buckner had been "indicated" for child abuse, but she was also aware that the "indicated" finding had been changed to "unfounded." Welenc therefore recommended that Jennifer be placed with Buckner. On July 8, 1999, Williams, who was unaware of the allegations against Buckner, placed Jennifer in the Buckner home.

Approximately six weeks later, at 8:50 a.m., on August 19, 1999, Buckner brought Jennifer, then two years and eight months old, to the emergency room at the Loyola University Medical Center. Jennifer was in an unresponsive state, suffering from seizures and a very slow heart rate and respiratory rate. Her situation was life-threatening. An initial physical exam revealed only a small abrasion below Jennifer's nose, and a laceration on her lower lip. A computed tomography ("CAT") scan of Jennifer's head, however, revealed an "acute right frontoparietal subdural hematoma with a left midline shift." Pl.'s Ex. 2. Jennifer also suffered from "retinal hemorrhages on multiple areas and levels." *Id.* Emergency surgery successfully "evacuated" the subdural hematoma. *Id.* However, during Jennifer's postoperative recovery, she developed "herniation syndrome" as a result of "increased intercranial pressure." *Id.* Jennifer's physicians successfully treated this condition, and she

was transferred to the Rehabilitation Institute of Chicago on September 8, 1999.

Buckner explained that Jennifer had suffered these injuries by falling out of her crib about three feet onto a carpeted floor. Physicians, however, indicated that Jennifer's injuries were consistent with shaken baby syndrome. In 2001, Buckner was indicted for the crime of aggravated battery of a child. Buckner pled guilty, and was sentenced to three years in prison.[1]

Jennifer was left brain damaged, partially paralyzed on her left side, with moderate mental retardation, a seizure disorder, and speech and learning problems. In a letter sent to the Cook County Public Guardian on December 13, 2004, Dr. Michael Kohrman, M.D. offered the following long-term prognosis for Jennifer:

> [Jennifer's] care plan will require physical therapy, occupational therapy and speech therapy throughout her childhood years along with continued physical therapy, occupational therapy and speech therapy as an adult. She will require continued anticonvulsant medications and may be a candidate for epilepsy surgery or vagus nerve stimulator implantation. She will require trips to the emergency room on average once per year for seizures and injuries secondary to seizures. In addition one hospitalization for the same should be planned for yearly. She will require MRI scans over the next few years to better elucidate the nature of her injuries as part of a pre-surgical evaluation for treatment of her epilepsy. She may also require positron emission tomography scan (PET scan). Long term Jennifer will need follow-up every three to six months for her seizures. PT, OT and speech therapy weekly until late adolescence then every 3–6 months once her function has stabilized. Jennifer will

> need life long care for her hemiparesis, including rehabilitation medicine and bracing or assistive devices, wheel chair, lift, ramps and other modifications to living spaces. Given her moderate mental retardation it is unlikely that Jennifer will be able to live independently. She will need adult supervision at a minimum of a group home setting. It is also unlikely that she will be able to earn any significant income other than pocket money via workshop environment.

Pl.'s Ex. 3.

## C. Procedural History

Jennifer filed her initial Complaint, by her Next Friend, Attorney, and Public Guardian Patrick T. Murphy, on September 12, 2000. Jennifer then filed her Amended Complaint on February 15, 2001. The one Count Amended Complaint alleges a violation of Jennifer's substantive due process rights under 42 U.S.C. § 1983. Defendants filed a Motion to Dismiss the Amended Complaint, which the court denied on February 19, 2002. On December 9, 2004, the court granted Jennifer's Motion to substitute Robert Harris, the new Cook County Public Guardian, as Plaintiff in this case. Defendants filed a Suggestion of Death as to Rosetta M. Smith pursuant to Federal Rule of Civil Procedure 25(a)(1) on September 16, 2005. Defendants then moved to dismiss Smith pursuant to Rule 25(a)(1). The court granted that Motion on December 29, 2005.

Defendants filed their Motion for Summary Judgment on September 30, 2005. Plaintiff responded to this Motion on October 31, 2005. Defendants filed their reply on November 22, 2005. This Motion is fully briefed and before the court.

---

1. Counsel for the parties have not provided the specific facts to which Buckner admitted when entering her plea of guilty in the Circuit Court of Cook County.

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is permissible when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir.1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. *See Murphy v. ITT Educational Services, Inc.*, 176 F.3d 934, 936 (7th Cir.1999).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir.1996). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. FED. R.CIV.P. 56(c); *see also Perdomo v. Browner*, 67 F.3d 140, 144 (7th Cir.1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *see also First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 280, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 922 (7th Cir.1996). The choice between reasonable inferences from facts is a jury function. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When the defendant moves for summary judgment, the court must view the record and all inferences in a light most favorable to the plaintiff. *Ameritech Benefit Plan Comm. v. Communication Workers of Am.*, 220 F.3d 814, 821 (7th Cir.2000).

However, the inferences construed in the plaintiff's favor must be drawn from specific facts identified in the record that support the plaintiff's position. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922–23 (7th Cir.1994). Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." *Thomas v. Christ Hospital and Medical Center*, 328 F.3d, 890, 892–93 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

### B. Defendant's Motion for Summary Judgment

Defendant asserts that she is entitled to summary judgment for two reasons. First, she asserts that she is entitled to summary judgment because her actions were not deliberately indifferent to Jennifer, nor did she affirmatively place Jennifer in a position of danger. Second, she asserts that she is entitled to summary judgment because, as a government official, she is entitled to qualified immunity.

#### 1. Defendant's actions do not rise to the level of a constitutional due process violation of Jennifer Y.'s rights

Jennifer brings her claim solely under 42 U.S.C. § 1983, asserting a violation of her Fourteenth Amendment right to substantive due process. To prevail on such a claim, Jennifer must show that (1) Defendant deprived her of a right secured by the Constitution, and (2) that the Defendant acted under color of state law. *See J.H. ex rel Higgin v. Johnson*, 346 F.3d 788, 791 (7th Cir.2003). No party disputes whether the Defendant in this case, a DCFS supervisor, was acting under color of state law. The only remaining issue is therefore whether Jennifer was deprived of a Constitutional right.

■ As a general rule, the state has no constitutional duty to protect one private citizen from the harmful actions of another.

> But nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimum levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means ... [The Due Process Clause's] purpose was to protect the people from the State, not to ensure that the State protected them from each other.

*DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 195–96, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *see also Collignon v. Milwaukee County,* 163 F.3d 982, 987 (7th Cir.1998).

■ Courts, however, recognize two exceptions to this general rule. The first of these is known as the "special relationship" exception. The *DeShaney* court explained that

> when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being ... The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*DeShaney,* 489 U.S. at 199–200, 109 S.Ct. 998; *see also Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (requiring the State to provide services and care to involuntarily committed mental patients); *Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (requiring the State to provide medical care for suspects in police custody); *Monfils v. Taylor,* 165 F.3d 511, 516 (7th Cir.1998). In *K.H. v. Morgan,* the Seventh Circuit held that the "special relationship" exception applies to children removed from the custody of their parents by the state: such children have a due process right not to be placed in an abusive foster home. 914 F.2d 846, 849 (7th Cir.1990); *see also DeShaney,* 489 U.S. at 201 n. 9, 109 S.Ct. 998. Foster children therefore have a constitutional right not to be placed with foster parents whom the state knows or suspects to be abusive. *K.H.,* 914 F.2d at 852. When the state places a foster child with such parents, the state has acted with "deliberate indifference," and the foster child may prevail on a § 1983 claim. *J.H.,* 346 F.3d at 792.

■ The second exception to this general rule is the "state-created danger" exception. In *DeShaney,* the court indicated that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *DeShaney,* 489 U.S. at 201, 109 S.Ct. 998. "From that statement courts have concluded that liability exists when the state 'affirmatively places a particular individual in a position of danger the individual would not otherwise have faced.'" *Monfils,* 165 F.3d at 516 (quoting *Reed v. Gardner,* 986 F.2d 1122, 1125 (7th Cir.1993)). Foster children therefore have a constitutional right not to be affirmatively placed in a potentially dangerous situation that they would not have faced absent being placed into foster care. *See id.*

### a. special relationship & deliberate indifference

There is no dispute that Jennifer was taken into custody by DCFS, and placed into foster care. Both parties thus agree that Jennifer falls under the "special relationship" exception. In order to prevail under this exception, Jennifer must therefore show that Velazquez acted with deliberate indifference in lifting the hold on Buckner's home. *See J.H.*, 346 F.3d at 792. In other words, Jennifer must provide evidence that Velazquez lifted the hold while she had actual knowledge, or suspicion, that Buckner was abusive. *See K.H.*, 914 F.2d at 852. This Jennifer cannot do.

Jennifer argues reasonably that Velazquez suspected that Buckner was abusive. Indeed, deposition testimony clearly indicates that Smith reported the accusations against Buckner to Velazquez, her supervisor. However, the Seventh Circuit has indicated that where accusations of abuse against a foster parent are later determined to be unfounded, DCFS workers cannot be held liable for placing a child into that foster parent's home.

> Ideally, given the severity of potential harm to children, the strictest precautions should be employed in making foster care placements. Indeed, one could argue that any accusation that an individual abused a child, whether fully established or not, should presumptively disqualify him or her from serving as a foster parent. However, the demands of the placement process may restrict such an approach with the limited number of appropriate foster parents and occasional false accusations of abuse. *Against this backdrop, we cannot conclude in this case that the placement of a child with an individual who had two past accusations of child abuse that were investigated and determined to be unfounded warrants imposing liability on the defendants.*

*J.H.*, 346 F.3d at 794 (emphasis added). Given the Seventh Circuit's clear directive on this matter, the court must find as a matter of law that despite what appears to be suspicion on the part of Velazquez that Buckner was abusive, because the accusations against Buckner were later "unfounded," Velazquez cannot be held liable for the harms Buckner inflicted on Jennifer.

Moreover, the court notes that it was not Velazquez who placed Jennifer into Buckner's home. It is undisputed that DCFS caseworker Williams placed Jennifer into Buckner's home, on the recommendation of Welenc, the lead foster parent advocate for Cook County. Velazquez admits that she signed a document lifting the hold on Buckner's foster parent license, but only after the report of abuse was determined to be "unfounded." Jennifer thus seeks to hold Velazquez liable for Jennifer's injuries following this chain of events: Buckner allegedly abused Rayshawn; Investigator Seimen initially "indicated" Buckner for abuse; DCFS worker Anderson placed a "hold" on Buckner's foster care license; DCFS counsel, for reasons that are unclear, "unfounded" the allegations of abuse; Smith failed to undertake a licensing investigation of Buckner's home; DCFS supervisor Brown recommended to Velazquez that the "hold" be lifted on Buckner's license; Velazquez signed a document lifting the "hold;" Welenc recommended to Williams that Williams place Jennifer into Buckner's home; Williams placed Jennifer into Buckner's home; Buckner abused Jennifer. The court finds that on this set of facts, Velazquez' signing the document lifting the hold on Buckner's license is too attenuated from Jennifer's injuries to be the proximate cause of those injuries.

What we do mean by the word "proximate" is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point ... The court must ask itself whether there was a natural and continuous sequence between cause and effect. Was the one a substantial factor in producing the other? Was there a direct connection between them, without too many intervening causes? Is the effect of cause on result not too attenuated?

*Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 162 N.E. 99, 103–04 (N.Y.1928); *see also Movitz v. First Nat'l Bank of Chicago*, 148 F.3d 760, 762 (7th Cir.1998) ("but-for causation is not enough to establish civil liability for carelessness or other wrongdoing").

█ In addition, Jennifer asserts that Smith's failure to perform a licensing investigation of Buckner's home after the reports of abuse surfaced amounts to deliberate indifference. Setting aside for a moment the fact that Smith is no longer a party to this case, this failure, by law, cannot amount to deliberate indifference. The Seventh Circuit has indicated that the failure to perform a background check into a potential foster parent does not amount to actual knowledge or suspicion of past abuse. "[A] failure to abide by a general statutory requirement for background checks cannot substitute for the requirement of actual knowledge or suspicion in the foster home context." *Waubanascum v. Shawano County*, 416 F.3d 658, 667 (7th Cir.2005). Were Smith still a party to this suit, she could therefore not be held liable for her failure to perform an investigation into Buckner's fitness as a foster parent.

#### b. state-created danger

In order to prevail under this exception, Jennifer must show that the state affirmatively placed her into a dangerous situation she would not otherwise have faced. *See Monfils*, 165 F.3d at 516. The Seventh Circuit has identified instances of such "state-created danger." In *Kneipp v. Tedder*, for example, Plaintiff Samantha Kneipp was walking home from a tavern with her husband Joseph in an obvious state of inebriation (she was so intoxicated that she could not stand or walk without assistance), when police officers stopped the pair. 95 F.3d 1199, 1201–1202 (3d Cir.1996) (cited by *Monfils*, 165 F.3d at 516). Police officers questioned these individuals, then sent Joseph home alone. *Id.* After further questioning Samantha, the police sent her on her way, also alone. *Id.* Hours later, Samantha was found passed out in a snowbank, suffering from hypothermia. Samantha suffered permanent and debilitating brain damage. *Id.* at 1203. The Third Circuit reversed the district court's grant of summary judgment for defendants, and remanded. *Id.* at 1213–14. In *Dwares v. City of New York*, a rally was held in a New York City park which was to include the burning of an American flag. 985 F.2d 94, 96 (2nd Cir.1993) (cited by *Monfils*, 165 F.3d at 516). Also present at this rally was a group of "skinheads," a group known to have a history of violence towards those individuals engaged in First Amendment activity. *Id.* During this rally, a number of "skinheads" attacked the Plaintiff, while New York City Police Officers allegedly stood by and watched, making no attempt to intervene. *Id.* Plaintiff alleged that the Police Officers had agreed amongst themselves to permit the "skinheads" to attack the demonstrators. *Id.* at 96–97. The Second Circuit determined that these allegations properly stated a claim under § 1983. *Id.* at 96.

█ In this case, Jennifer provides no evidence that Velazquez engaged in the sort of immediate, affirmative action described in the above two cases. In both

*Kneipp* and *Dwares*, the defendants allegedly took positive steps to place the plaintiffs in immediate and recognizable danger. These are the sorts of cases where the state-created danger exception applies. In this case, Velazquez merely approved the lifting of the "hold" on Buckner's foster care license. As described above, the lifting of this "hold" was just one step in a long sequence of events that ended, tragically, with Jennifer's injuries. Velazquez took no action comparable to the immediately harmful actions of the defendants in *Kneipp* and *Dwares*. The court therefore determines that the "state-created danger" exception does not apply to this case.

### c. Jennifer cannot recover under either the special relationship or the state-created danger exceptions to *Deshaney*

For all the above reasons, the court therefore finds that Jennifer cannot recover under either of the above noted exceptions to the *DeShaney* rule. The undisputed facts in this case indicate that Velazquez did not act with deliberate indifference towards Jennifer, nor did Velazquez affirmatively place Jennifer in a situation of danger that she otherwise would not have faced. *See Monfils*, 165 F.3d at 516. Setting aside the issue of proximate cause, even if Velazquez' actions were negligent, "[n]egligence or even gross negligence does not suffice to give rise to liability under § 1983." *Lewis v. Anderson*, 308 F.3d 768, 773 (7th Cir.2002). The court therefore determines that there has been no violation of Jennifer's constitutional rights. Although the court makes this determination dispositively, it will, with an abundance of caution, inquire into whether Velazquez would otherwise be entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

### 2. Defendant is entitled to qualified immunity

It is well-settled that "qualified immunity shields government officials who are performing discretionary functions from liability from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir.1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *see also Gorman v. Robinson*, 977 F.2d 350, 354 (7th Cir.1992). There is sound public policy behind shielding government officials from civil liability in this manner. "[Qualified immunity] allows officials to carry out their duties confidently, without fear of incurring unexpected liability, and it allows courts to dispose of insubstantial claims prior to trial, sparing officials from unnecessary litigation." *Pounds v. Griepenstroh*, 970 F.2d 338, 340 (7th Cir.1992); *see also Flenner v. Sheahan*, 107 F.3d 459, 462 (7th Cir.1997).

When inquiring into whether government officials are entitled to qualified immunity, the court must focus "on the legal reasonableness of the action, not the state of mind of the officials in question." *Erwin*, 92 F.3d at 525. To prevail on the issue of qualified immunity,

[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Gorman*, 977 F.2d at 354.

The court must begin its inquiry into the issue of qualified immunity with the following "threshold question: Taken in the light

most favorable to [Jennifer], do the facts alleged show [Velazquez'] conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151; *see also Berman v. Young*, 291 F.3d 976, 983 (7th Cir.2002); *Erwin*, 92 F.3d at 525. The court has already dispositively determined that Velazquez has not violated Jennifer's constitutional rights. There is therefore "no necessity for further inquiries concerning qualified immunity." *See Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

█ However, the court will assume, *arguendo*, that Jennifer's allegations do make out a constitutional violation of her rights. The next step in the qualified immunity analysis is "to ask whether the right was clearly established" at the time Velazquez allegedly violated that right. *See id.* The answer to this question is no. Velazquez's actions in lifting the hold on Buckner's foster license did not violate a clearly established constitutional right of Jennifer's. Even if the court were to hold that Jennifer has a constitutional right to be free from placement into the care of a foster parent whose license had been restored after allegations of abuse against that foster parent were administratively "unfounded," that right was not clearly established during the time period relevant to this case. *See id.* Moreover, Velazquez was not constitutionally required to investigate Buckner after her record had been voluntarily expunged by DCFS.

Jennifer cannot overcome the qualified immunity defense by pointing to her general constitutional right to be placed in safe foster care. Jennifer "may not escape the doctrine of qualified immunity by alleging a violation of a clearly established, but very broad constitutional right." *Bakalis v. Golembeski*, 35 F.3d 318, 323 (7th Cir.1994); *see also Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[I]f the test of 'clearly established law' were to be applied at [a very basic] level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*.").

## III. CONCLUSION

At the age of two years and eight months, Jennifer suffered extraordinarily serious injuries at the hands of her foster mother, Kaundra Buckner. Jennifer faces a lifetime of partial paralysis, seizures, and mental retardation. She will require repeated hospitalizations, along with physical, occupational, and speech therapy. Jennifer will most likely never be able to live independently, and she will never fully recover from the harms she has sustained. The court is profoundly saddened by these events, but it cannot look to its sense of sympathy alone to decide this case. Rather, the court must decide this case as the law requires.

Seventh Circuit and Supreme Court caselaw cited by the court, and the undisputed facts in this case, indicate that Velazquez did not act with deliberate indifference towards Jennifer, nor did Velazquez affirmatively place Jennifer in a position of danger. Velazquez therefore did not violate Jennifer's constitutional rights. Assuming, *arguendo*, that Velazquez did violate Jennifer's constitutional rights, those rights were not clearly established when the relevant events in this case took place. Velazquez is thus entitled to qualified immunity from this suit. Moreover, as the court has determined, Velazquez' actions in lifting the hold on Buckner's foster care license were not the proximate cause of the injuries inflicted by Buckner. Defendant's Motion for Summary Judgment is therefore granted.

IT IS SO ORDERED.