S.W., by and through his guardian, Renee MARQUIS–ABRAMS; T.G. and J.L., by and through their next friend, Mildred Del Grosso; S.B. and R.E. by and through their guardian, Patricia Baldwin; L.J. and J.G., by and through their guardian, Kevin Hendrickson; J.B., C.B., and T.L., Plaintiffs,

v.

CITY OF NEW YORK, a municipal corporation; Administration for Children's Services, f/k/a Child Welfare Administration; St. Joseph Services for Children, Inc., f/k/a Catholic Child Care Society of the Diocese of Brooklyn, Inc., a New York corporation; Heartshare Human Services, f/k/a Catholic Guardian Society of the Diocese of Brooklyn, Inc., a New York corporation; SCO Family of Services, f/k/a St. Christopher–Ottilie, a New York corporation, Defendants.

No. 09–CV–01777 ENV MDG.

United States District Court, E.D. New York.

Signed Jan. 17, 2014.

Filed Jan. 28, 2014.

Ami Romanelli, Theodore Babbitt, Stephan A. Le Clainche, Babbitt, Johnson, Osborne & Le Clainche, PA, West Palm Beach, FL, Howard M. Talenfeld, Colodny, Fass, Talenfeld, Karlinsky & Abate, P.A., John Walsh, Fort Lauderdale, FL, William A. Kapell, Children's Rights, Marcia Lowry, New York, NY, for Plaintiffs.

Bruce Michael Strikowsky, Carl Judah Schaerf, Matthew James Kelly, Allison Naomi Fihma, Schnader Harrison Segal & Lewis LLP, New York, NY, Jeremy S. Rosof, Timothy Robert Capowski, William G. Spratt, Adam S. Covitt, Ralph Vincent Morales, Robert Ortiz, Shaub, Ahmuty, Citrin & Spratt, LLP, Lake Success, NY, Judd Cohen, Robert Boccio, Shaub, Ahmuty, Citrin & Spratt, LLP, New Hyde Park, NY, Marc J. Citrin, Steven J. Ahmuty, Jr., Craig Garrett Bienstock, John D. Paterniti, Juan C. Gonzalez, Steven I. Rubin, Shaub Ahmuty Citrin & Spratt LLP, New York, NY, for Defendants.

## MEMORANDUM & ORDER

VITALIANO, District Judge.

Between 1986 and 1996, plaintiffs, ten individuals who were at the time special needs children, were placed in foster care with, and were subsequently adopted by, Judith Leekin, who abused, neglected, imprisoned, and denied them any education or medical care. Plaintiffs bring this action against the City of New York (the "City") and the private foster care agencies that placed them with Leekin, namely, St. Joseph Services for Children, Inc. ("SJSC"), Heartshare Human Services ("HHS"), and SCO Family of Services ("SCO") (together,

the "agency defendants").[1] They seek damages for alleged violations of their Fourteenth Amendment rights and for negligence, based on alleged failures that allowed Leekin to fraudulently obtain foster care custody of them and then, later, to adopt them. The agency defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, that motion is denied in part and granted in part.

## Background

The following facts are drawn from the complaint and the submissions of the parties on the motion, including their statements of undisputed material fact filed pursuant to Local Civil Rule 56.1. The facts are construed, as they must be in the summary judgment context, in the light most favorable to plaintiffs, as the nonmoving parties. *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.,* 473 F.3d 450, 456 (2d Cir.2007) (citation omitted). Any factual disputes are noted.

The story is undisputedly sad and tragic. From 1986 to 1994, plaintiffs were all classified as special needs children, and were removed from their homes and placed in the custody of the City. (Compl. ¶ 2.) The agency defendants were private child care agencies that provide foster care placement and other services for children in the custody of the City, pursuant to contracts with the City. (Compl. ¶¶ 47, 49, 51.) During this time, Leekin, using at least four false identities, obtained foster care custody of plaintiffs and numerous other special needs children from the City and the agency defendants. She subsequently adopted each plaintiff.[2] (Compl. ¶ 56.) As was later revealed, Leekin launched this scheme in order to collect subsidies provided by the City for the fostering and adoption of special needs children, which she used for her own purposes while neglecting to care for plaintiffs.[3] In 1998, Leekin

---

1. The City settled with plaintiffs on December 19, 2012. (*See* Dkt. No. 388 (so-ordered stipulation).) The agency defendants and the City have also interposed complaints against numerous third-party defendants in this case. The third-party actions have no bearing on this motion and will not be addressed in its disposition.

2. Plaintiff S.B. was placed by SCO in foster care in Leekin's home on May 9, 1986 and was subsequently adopted by her under the alias Anne Marie Williams on July 28, 1988. Plaintiff L.J. was placed by the City in Leekin's care on May 7, 1988 and was subsequently adopted by her under the alias Cheryl Graham on May 4, 1993. Plaintiff J.G. was placed by the City in Leekin's care on September 30, 1988 and was subsequently adopted by her under the alias Cheryl Graham on May 4, 1993. Plaintiff S.W. was placed by SJSC in Leekin's care on June 28, 1989 and was subsequently adopted by her under the alias Michelle Wells on December 13, 1994. Plaintiff R.E. was placed by SJSC in Leekin's care on March 27, 1992 and was subsequently adopted by her under the alias Michelle Wells on June 20, 1995. Plaintiff

J.B. was placed by SJSC in Leekin's care on May 26, 1993 and was subsequently adopted by her under the alias Michelle Wells on June 7, 1994. Plaintiff C.B. was placed by SJSC in Leekin's care on May 26, 1993 and was subsequently adopted by her under the alias Michelle Wells on June 7, 1994. Plaintiff T.G. was placed by SJSC in Leekin's care on December 5, 1992 and was subsequently adopted by her under the alias Michelle Wells on June 7, 1994. Plaintiff T.L. was placed by HHS in Leekin's care on July 15, 1994 and was subsequently adopted by her under the alias Eastlyn Giraud on April 16, 1996. Plaintiff J.L. was placed by HHS in Leekin's care on July 15, 1994 and was subsequently adopted by her under the alias Eastlyn Giraud on April 16, 1996. (Def.'s Local Rule 56.1 Statement ("Def.'s 56.1 Stmt") at ¶¶ 4–13.)

3. Following her arrest in Florida in July 2007, Leekin pleaded guilty to charges of, *inter alia,* aggravated child abuse and aggravated disabled/adult abuse in Florida, and mail and wire fraud in New York, and is currently incarcerated. (*See* Def.'s 56.1 Stmt ¶¶ 33, 246, 259–60.)

transported plaintiffs from New York to Florida, where she relocated them in various houses over the following years. (See Def.'s 56.1 Stmt. ¶¶ 118–142). With the exception of J.B., who left the house in which they lived sometime between May 2004 and May 2005,[4] plaintiffs remained with Leekin until July 2007, when Florida authorities searched the house in which they were then residing, discovered and removed plaintiffs, and arrested Leekin. (See Def.'s 56.1 Stmt ¶¶ 149, 243.)

From the point when Leekin obtained custody of plaintiffs until they were released in July 2007, Leekin abused, tortured, neglected, and held plaintiffs in captivity, first in New York and then in Florida. It would be impossible here to describe in detail the brutality plaintiffs were subjected to over the course of their captivity, some for more than 15 years, but the following examples provide a glimpse of life in Leekin's house of horrors: Leekin routinely and for lengthy periods denied the children access to food and a toilet; handcuffed and restrained them for hours, including all night restraint with zip ties; trapped them in cribs held shut with boards and heavy objects; beat them with a belt, nightstick, and other objects; forced them to stand for hours on end, sometimes with their hands above their heads, as punishment; failed to protect them from sexual abuse; and repeatedly threatened them with a gun or with being beaten to death. (See Aff. of Dr. Peg McCart Hess, May 2, 2013, Ex. A ("Hess Report") at 3, 38–39, 62–64.) In New York, plaintiffs were often confined to the basement, where they were forced to sleep uncovered on the floor; in Florida, they generally slept on the floor of the garage. Id. If anyone came to the house where they were kept, plaintiffs were placed in a room and told to be quiet, and were threatened that if they did not remain quiet, they would be beaten.[5] Pl.'s Statement of Additional Disputed Material Facts ("Pl.'s Stmt. of Add'l Facts") ¶ 321; Hess Report at 63.) When removed from Leekin's Florida home in 2007, the ages of the named plaintiffs ranged from 15 to 27. None had completed elementary school; only three could read, and even then only at a third grade level. None had had any contact with a member of their biological families. Six were declared either "totally incapacitated" or "vulnerable adults." (Hess Report at 4.)

Plaintiffs commenced this action on April 29, 2009. Plaintiffs allege that the

---

4. Defendants submit that J.B. left Leekin's home on November 20, 2004, based on deposition testimony given by S.W. (Def.'s 56.1 Stmt ¶ 143). Plaintiffs fail to dispute this fact, (Pl.'s 56.1 Stmt ¶ 143) but elsewhere point to testimony that J.B. left when he was "about 17," and given that J.B. turned 17 on May 18, 2004, assert that he left at some point between May 2004 and May 2005. The outcome of this motion would be the same based on either date.

5. The agency defendants—while not disputing plaintiffs' account of their experience in Leekin's custody—point to certain excerpts of plaintiffs' deposition testimony that they contend demonstrate that plaintiffs' experienced "elements of normalcy" during this time. (Def.'s 56.1 Stmt ¶ 150.) Apparently, at times before 1995, Leekin took S.B. to Macy's, and in Florida, two plaintiffs were taken to an amusement park with Leekin's biological grandchildren; at certain times throughout their 20-year ordeal, some of the plaintiffs were also allowed to watch television or play with toys. The agency defendants also point out that some of the plaintiffs believed that their lives were "good" or "normal" at times. (See Def.'s 56.1 Stmt ¶¶ 151–178.) Plaintiffs vigorously dispute these excerpts as gross mischaracterizations of the environment of pervasive abuse and neglect in which they lived, (see Pl.'s 56.1 Stmt ¶¶ 150–178), and argue that they only demonstrate how removed plaintiffs were from the world and from any understanding of a normal childhood.

agency defendants failed to properly screen Leekin as a potential foster parent, monitor plaintiffs while they were in Leekin's care, or undertake their duties in connection with investigating Leekin prior to plaintiffs' adoptions, and that the defendants' reckless indifference to their duties and to plaintiffs led to plaintiffs' fraudulent adoption and abuse by Leekin. Plaintiffs bring claims against the agency defendants for violation of 42 U.S.C. § 1983 as well as for common law negligence.[6] The agency defendants seek summary judgment on a host of grounds.

Preliminarily, there are factual disputes surrounding how Leekin came to obtain custody of plaintiffs so long ago. Bluntly, the aged and incomplete nature of the agency defendants' records makes it difficult at times to piece together the relevant events. It is undisputed, though, that in applying to be a foster parent under her various false identities, Leekin provided the agency defendants with false names, and at least in the case of SJSC and HHS, with one or more falsified documents such as birth certificates, W–2s, written references, and Social Security cards.[7] (*See,* *e.g.,* Def.'s 56.1 Stmt ¶¶ 67, 69 (SJSC); 106(HHS).) Plaintiffs, correspondingly, acknowledge that Leekin provided false information to the agency defendants, but,

relying on the agency defendants' records and their employees' testimony, assert that the agency defendants failed to take certain reasonable—and at times statutorily required—steps which would have uncovered the phony nature of Leekin's background information. For example, it is uncontradicted that none of the agency defendants requested or obtained photo identification from Leekin. (*See* Pl.'s Stmt of Add'l Facts ¶ 7.) Further, none sought to verify the Social Security numbers Leekin gave them, which did not match the aliases she provided (and SCO's records do not reflect Leekin being asked for a Social Security number at all).[8] (*See id.* ¶ 22.) Plaintiffs also assert that the agency defendants failed to obtain from Leekin the number of references required by state regulation, or to conduct mandatory in-person interviews with the references she did provide. (*See* Pl.'s 56.1 Stmt ¶ 34(c); Pl.'s Stmt of Add'l Facts ¶ 56, 59–61, 88, 110–11, 146.) Nor did the agency defendants question references that, plaintiffs allege, were obviously lacking, such as an employment reference that, although appearing to be on New York Life Insurance Company letterhead, contained no phone number, address, or contact information for the reference.[9] (Pl.'s Stmt. of Add'l Facts ¶ 54).

6. All plaintiffs bring a § 1983 claim together against all of the agency defendants; each plaintiff additionally brings a negligence claim only against the agency that placed him or her with Leekin. L.G. and J.G., who were placed with Leekin by the City, join the § 1983 claim but do not assert negligence claims.

7. The agency defendants do not assert in their submissions that such information was provided to SCO.

8. The agency defendants dispute that it would have been possible to verify an applicant's Social Security number during the relevant time period. Plaintiffs provide expert testi-

mony that it was possible at the time of plaintiffs' foster placements to have Social Security numbers verified by the Social Security Administration by phone or written communication, and that this was done by the City in some circumstances. (*See* Aff. of Mark E. Safarik, May 2, 2013 ("Safarik Aff."), Ex. A at 33–35.) It is undisputed, however, that such verification was not required by law at the time.

9. Leekin testified that the people she used as references only knew her by her real identity, not the aliases she gave the agency defendants. (*See* Kapell Decl. Ex. 40, Leekin Dep. 10/22/2010, at 57:21–61:9, 150:10–151:17.) While Leekin's veracity is obviously dubious,

Each of the agency defendants also visited Leekin's home in Queens and conducted inspections in connection with approving and annually recertifying Leekin as a foster parent, and later as an adoptive parent. The parties dispute, however, what occurred during the inspections and home visits and whether they were sufficiently thorough. (Compare *id.* at ¶¶ 68, 88 with Pl.'s 56.1 Stmt. at ¶¶ 68, 88). In particular, plaintiffs point out that, as reflected by their records, none of the agency defendants inspected the basement, where Leekin hid plaintiffs. (Pl.'s 56.1 Stmt. ¶ 22, 108; Pl.'s Stmt. of Add'l Facts ¶¶ 22, 24.) Leekin falsely told at least SCO that its employees could not inspect the basement because it was being rented by a third party, a claim that SCO apparently never attempted to verify. (*See* Pl.'s Stmt of Add'l Facts ¶ 172.)

Plaintiffs further assert that the agency defendants failed to identify or investigate numerous inconsistencies and red flag representations on the face of the documents Leekin provided to each of them in connection with her applications and their investigations. For example, the information that Leekin provided was internally inconsistent as to whether, where, and for how long she was employed; her religion, which she sometimes reported as Catholic, sometimes as Protestant, sometimes as Baptist; the number of bedrooms in her home; whether she owned the home; and various facts about her family members, such as whether she had siblings, and her mother's name. (*See, e.g.,* Pl.'s Stmt of Add'l Facts ¶¶ 48–52, 113–14, 140–42, 164, 174.) The agency defendants do not dispute the existence of these inconsistencies, but do dispute their materiality.

Plaintiffs also allege failures in monitoring while in foster care. For example, plaintiffs claim that HHS and SCO failed

to make monthly visits to the plaintiffs they placed, a claim the agency defendants dispute. (*See* Def.'s 56.1 Stmt ¶ 108.) It appears to be undisputed, however, that the agency defendants failed to conduct unannounced visits to Leekin's home, as opposed to scheduled visits, and that Leekin often changed the dates and times of scheduled visits, failed to keep appointments for scheduled visits, or brought the children into the agency for visits that were supposed to take place in her home. (Compl. ¶¶ 184–85.) When the agency defendants did visit, plaintiffs allege that they failed to speak with plaintiffs outside of Leekin's presence, and that the visits were essentially nothing more than a rubber stamp. (*See* Compl. ¶¶ 186–87, 190.) Additionally, it is undisputed that SJSC placed five special-needs children between the ages of one and five with "Michelle Wells," who claimed to be a single woman working full-time, which SJSC acknowledged was "very unusual." (Conway Dep., 8/18/10, at 190:22).

At the same time, the agency defendants present evidence that outside observers unanimously gave Leekin high marks as foster parent. For example, early progress notes state that after his placement with Leekin, plaintiff S.B. had "calmed down a lot," "interacted very well with everyone," and was "improving nicely," and caseworker reviews were positive. (*See* Def.'s 56.1 Stmt ¶ 49, 53.) A psychiatrist found that S.B. was improving under Leekin's care, (*id.* at ¶ 56), and S.B.'s court-appointed guardian *ad litem* issued a positive report about his relationship with Leekin. (*Id.* at ¶ 57.) There were similarly positive reports for other of plaintiffs as well. (*See id.* at ¶¶ 82–86 (R.E.), 109–10, 114 (T.L. and J.L.)) Plaintiffs do not dispute these facts, but argue

to say the least, this suggests that she wrote the reference letters for her aliases herself.

that such positive feedback was a result of the alleged deficiencies in the agency defendants' monitoring of plaintiffs. For example, plaintiffs point out that S.B. had at least ten different caseworkers in the 26 months between his placement with Leekin and his adoption, which, plaintiffs argue, undermined the quality of any communication they had with S.B.; plaintiffs also note that the psychiatrist who issued the report on S.B. saw S.B. only twice, one year apart; and point to what they allege are glaring inconsistencies between the information Leekin reported to the guardian *ad litem* and the information she reported to SCO. (*See* Pl.'s 56.1 Stmt ¶¶ 51, 55, 57.) · Plaintiffs also contend that the positive Uniform Case Reports ("UCRs") that the agency defendants cite for positive feedback about Leekin fail to contain minimally adequate information regarding plaintiffs' placements, and contain identical language to prior UCRs. (*Id.* at 114.)

The agency defendants move for summary judgment on several grounds. First, they argue that the claims of three of the plaintiffs are barred by the statute of limitations. Next, they argue that plaintiffs' § 1983 claim should be dismissed because the agency defendants are not state actors; because the agency defendants did not act with the required mental state; for lack of causation; and because the claim is precluded by the *Rooker–Feldman* doctrine. Finally, the agency defendants argue that they are entitled to judgment on plaintiffs' negligence claims.

### Standard of Review

A district court must grant summary judgment if "there is no genuine issue as to any material fact" such that "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court's responsibility in assessing the merits of a summary judgment motion is not to try issues of fact, but rather to "determine whether there *are* issues of fact to be tried." *Sutera v. Schering Corp.,* 73 F.3d 13, 16 (2d Cir.1995) (quoting *Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d 238, 244 (2d Cir.1984)). The moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, *see Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005), and the Court will resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir.2004); *Gummo v. Vill. of Depew,* 75 F.3d 98, 107 (2d Cir.1996) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.").

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party. *See* Fed. R.Civ.P. 56(e). The nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Rather, the nonmoving party must "make a showing sufficient to establish the existence of [each] element to that party's case .... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. If the evidence favoring the nonmoving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505,

91 L.Ed.2d 202 (1986) (internal citations omitted).

### Discussion

#### I. Statute of Limitations

■ The agency defendants first argue that the claims of three plaintiffs, J.B., S.B., and S.W., are barred by the statute of limitations. As previewed above, plaintiffs bring two claims against the agency defendants: a civil rights claim under 42 U.S.C § 1983 and a common law negligence claim. "In section 1983 actions, the applicable limitations period is found in the 'general or residual [state] statute [of limitations] for personal injury actions.'" *Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997) (quoting *Owens v. Okure,* 488 U.S. 235, 249-50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989)). The statute of limitations for plaintiffs' § 1983 claims is thus three years. N.Y. C.P.L.R. ("CPLR") § 214(5). Likewise, the statute of limitations on plaintiffs' negligence claims is three years. *Id.* When plaintiffs' claims accrued, however, is a more complex and hotly disputed question.

■ The accrual date of a § 1983 cause of action is a question of federal law. *Wallace v. Kato,* 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007). A § 1983 claim "accrues once the 'plaintiff knows or has reason to know of the injury which is the basis of his action.'" *Veal v. Geraci,* 23 F.3d 722, 724 (2d Cir.1994) (quoting *Singleton v. New York,* 632 F.2d 185, 191 (2d Cir.1980)). In other words, "the claim accrues when the alleged conduct has caused the claimant harm and the claimant knows or has reason to know of the allegedly impermissible conduct and the resulting harm." *Veal,* 23 F.3d at 724. This concept of accrual is known as the "discovery rule." *Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002). The agency defendants argue that under this rule, each plaintiff's claim accrued as of the moment he or she first experienced abuse, because plaintiffs knew of their injuries as of that time. (Def.'s Mem. at 5–6). Acknowledging that plaintiffs were infants when that occurred, and as such their claims would have been tolled until they reached the age of majority, *see* CPLR § 208, the agency defendants argue that plaintiffs had three years after each of their 18th birthdays to file their complaint. That would mean that for three of the plaintiffs, J.B., S.B., and S.W., their claims are untimely, because they turned 21 on May 18, 2008, March 21, 2002, and June 16, 2008, respectively—all before the complaint was filed on April 29, 2009.

■ The limitations argument misses half the equation, however. Accrual is determined based on when plaintiffs knew of or had reason to know of *both* "the allegedly impermissible conduct *and* the resulting harm." *Veal,* 23 F.3d at 724 (emphasis added). Plaintiffs claim that their injuries were caused by the agency defendants' wrongful placement of them in Leekin's care; the abuse they suffered while in Leekin's care is merely the resulting harm. Even assuming that plaintiffs can be charged with awareness of their injuries as of their placement date, the pertinent question is when plaintiffs knew, or should have known, that the agency defendants had committed the conduct that plaintiffs allege led to their placement with Leekin. *See Barrett v. United States,* 689 F.2d 324, 328 (2d Cir.1982) ("... plaintiffs' cause of action accrued when they discovered or should have discovered the critical facts of [the victim's] injury and its cause. Since the injury was immediately known, the crucial question is when [the victim's] family should have discovered the critical facts relating to the cause of his death."); *Sledge v. Guest,* 107 F.3d 4 (2d Cir.1996) (reversing *sua sponte* dismissal of case because "though it is clear that

[plaintiff] became aware of his injury more than three years prior to bringing this action, there appear to be questions as to when he became, or reasonably should have become, aware that his injury could have been caused by jail officials' serving food that was contaminated.").[10]

■ Plaintiffs argue, and the agency defendants do not contest, that they could not have personally been aware that they were wrongfully placed in foster care by the agency defendants until after their rescue and Leekin's arrest in July 2007. Indeed, the record indicates that while living with Leekin, plaintiffs did not even know they were in foster care at all. (*See* Pl.'s Br. in Opposition to Def.'s Mot. ("Pl.'s Opp.") at 39.) Even if plaintiffs should have learned that the agency defendants were responsible for their placement with Leekin as of the day they were released from her custody, their claims, filed on April 29, 2009, would be timely. Thus it is not necessary to determine when, exactly, accrual of each plaintiff's § 1983 claim occurred; it is sufficient to say that it could not have occurred while plaintiffs were in Leekin's custody. Accordingly, S.B., and S.W.'s § 1983 claims are timely.

■ J.B. presents a different situation. Given that he escaped Leekin's home earlier than the other plaintiffs, his physical domination ended at the latest in May 2005.[11] Plaintiffs counter that, despite no longer being in Leekin's custody, J.B. had no way to know that defendant SJSC was responsible for his injuries until after Lee-

kin's arrest in July 2007, when the details of her scheme finally emerged. The argument also relies on the fact that J.B. was suffering from Post–Traumatic Stress Disorder, Cognitive Disorder and severe learning disabilities. (Pl.'s Opp. at 41). Whether J.B. should have been able to learn of the facts underlying his claim prior to April 20, 2006—three years before the filing of the complaint—is a disputed issue of fact, such that summary judgment as to whether J.B.'s § 1983 claim is time-barred is not appropriate. *Cf. Ormiston,* 117 F.3d at 71–72 (holding that, in the case of involuntary medical or psychiatric confinement, the fact that a plaintiff is unable to assert his rights as the result of mental incapacity may delay accrual of his claim for unconstitutional confinement).

■ Plaintiffs' negligence claims are a different matter. Under New York law, which governs accrual of these claims, a negligence claim accrues "when the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint," which is generally at the time that the plaintiff is injured. *Snyder v. Town Insulation, Inc.,* 81 N.Y.2d 429, 432–33, 599 N.Y.S.2d 515, 615 N.E.2d 999, 1000–01 (1993); *see Syms v. Olin Corp.,* 408 F.3d 95, 109 (2d Cir.2005) ("Historically, New York's statute of limitations generally began to run at the time of injury."). Plaintiffs argue that all elements of their claim could not be truthfully alleged until they became or could have become aware

---

**10.** Plaintiffs' claims accrued when they knew or should have known of the *fact* of defendants' actions, whether or not plaintiffs understood those actions to be negligent at that time—accrual does not depend on plaintiff's knowledge that the injury in question constitutes a legal wrong. *See, e.g., Lugo–Young v. Courier Network Inc.,* No. 10–CV–3197, 2012 WL 847381, at *5 (E.D.N.Y. Mar. 13, 2012); *see also United States v. Kubrick,* 444 U.S. 111, 122, 100 S.Ct. 352, 62 L.Ed.2d 259

(1979) ("The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask.").

**11.** *See supra* note 4.

of the agency defendants' wrongful acts, which could not have occurred until after their rescue in 2007. In other words, plaintiffs contend that a discovery rule should apply to their negligence claims. Unlike the § 1983 claim, however, the discovery rule does not apply to tort claims under New York law. *See Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 612 N.E.2d 289, 292 (1993) (The date of injury, "rather than ... discovery of the injury by plaintiff, is the relevant date for marking accrual."); *Greenwald v. City of New York*, No. 06–CV–2864, 2012 WL 6962297 (E.D.N.Y. July 19, 2012), *report and recommendation adopted*, 2013 WL 354169 (E.D.N.Y. Jan. 29, 2013) ("According to New York's general accrual rule, 'mere ignorance or lack of discovery of the wrong is not sufficient to toll the Statute of Limitations, which commences running when the wrong is perpetrated.' ") (quoting *Gen. Stencils, Inc. v. Chiappa*, 18 N.Y.2d 125, 127, 272 N.Y.S.2d 337, 219 N.E.2d 169 (1966)).

■ The agency defendants again argue that each plaintiff's negligence claim accrued as of the first time that Leekin abused him or her, an event defendants contend occurred as soon as each plaintiff was placed in Leekin's custody. A "first injury" rule is not appropriate in this action, however. "In New York, '(d)espite the general principle that a cause of action accrues when the wrong is done, regardless of when it is discovered, certain wrongs are considered to be continuing wrongs, and the statute of limitations, therefore, runs from the commission of the last wrongful act.' " *Leonhard v. United States*, 633 F.2d 599, 613 (2d Cir.1980) (quoting advisory note to CPLR § 203). Plaintiffs' negligence claims allege just such a continuing wrong. Indeed, plaintiffs allege a series of negligent acts or

omissions by the agency defendants over several years, of which their placement in foster care with Leekin was only the first. Other acts or omissions include the agency defendants' initial screening and investigation of Leekin, their placement of multiple special needs children in foster care with her, their deficient monitoring of plaintiffs after placing them in Leekin's care, and their handling of the adoption process. Plaintiffs allege that together, the combination of these pre-adoption wrongful acts resulted in their respective adoptions and the decade of abuse that followed. *See Thomas v. New York City*, 814 F.Supp. 1139, 1153 (E.D.N.Y.1993) (tort claims against foster care agencies based on abuse of children in their custody alleged a continuing wrong that did not accrue until "the continual negligent oversight by the defendants over the care of the infant plaintiffs while the children were in the defendants' custody" had ceased).

■ Notwithstanding, the continuing wrong exception does not save the day. The agency defendants' "last wrongful act" took place, at the latest, when plaintiffs were adopted by Leekin. Although Leekin continued to abuse and mistreat plaintiffs until 2007, the continuing violation doctrine "may only be predicated on continuing unlawful acts [by the tortfeasor] and not on the continuing effects of earlier unlawful conduct" *Selkirk v. State*, 249 A.D.2d 818, 819, 671 N.Y.S.2d 824, 825 (3d Dep't 1998) (rejecting argument that continuing wrong doctrine applied where plaintiff alleged that she continued to suffer effects of property seizure). It is a pathway to legal relief from continuing wrongdoing, not continuing suffering from stale wrongs. Plaintiffs allege no negligent conduct by the agency defendants after each of their adoptions were final-

ized.[12] Accordingly, there can be no dispute that under New York law, each plaintiff's negligence claim accrued no later than the date of adoption, which occurred for all plaintiffs between 1988 and 1996. The three-year statute of limitations clock started then.

 The story does not end there, of course, since, as noted earlier, all plaintiffs were infants at the time of claim accrual. CPLR § 208 tolls the statute of limitations on any such accrued claim until three years after an infant plaintiff turns 18. The agency defendants concede that, in light of the infancy toll, five of plaintiffs' negligence claims are timely. However, they argue that J.B., S.B., and S.W.'s negligence claims are time-barred, given that the complaint was filed more than three years after their respective 18th birthdays.

 Seeking to avoid this result, plaintiffs ask the Court to treat their negligence claim as a claim for false imprisonment, which in New York does not accrue until the plaintiff's release from confinement. *See Whitmore v. City of New York*, 80 A.D.2d 638, 639, 436 N.Y.S.2d 323, 324 (2d Dep't 1981). Plaintiffs advance the afterthought theory that this is the appropriate lens through which to view their claim. The confection rests on plaintiffs' claimed confinement against their will, incompetence to comprehend their loss of liberty, and inability to protect their rights

until after they had been released. (*See* Pl.'s Opp. at 40, 42.) Notwithstanding that there are, indeed, factual parallels, plaintiffs have interposed a negligence claim, not a false imprisonment claim, and, importantly, do not bring a claim against the individual who imprisoned them. In any event, this is, at bottom, simply another way of asking the Court to apply a discovery rule where New York law does not. The Court sees no ground on which to apply the law of false imprisonment to plaintiffs' negligence claims.

 The next straw is equity. Plaintiffs alternatively argue that equitable tolling should be invoked to toll the statute of limitations. Under federal law, equitable tolling may be available "as a matter of fairness where a plaintiff has been prevented in some extraordinary way from exercising his rights." *Pearl v. City of Long Beach*, 296 F.3d 76, 85 (2d Cir.2002) (internal quotation omitted); *see also Zerilli–Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir.2003) ("[E]quitable tolling is only appropriate in rare and exceptional circumstances...") (internal quotations and alterations omitted). However, while the facts of this case might well merit such extraordinary intervention, plaintiffs' negligence claim is governed by state law, and New York law does not recognize the federal rule of equitable tolling.[13] David D. Siegel, N.Y. Prac. § 56

---

**12.** This case is thus distinguishable from negligent supervision cases in which the alleged perpetrator was the defendant's employee for the entire period of abuse, in which case the allegedly negligent conduct has been found to have continued until the last act of abuse. *See John Doe No. 6 v. Yeshiva & Mesivta Torah Temimah, Inc.*, 21 Misc.3d 443, 444, 863 N.Y.S.2d 891, 893 (Sup.Ct. Kings Cty. 2008) (former student's negligence claims against operator of school for personal injuries from sexual abuse by teacher accrued on the last date of abuse); *Pichardo v. New York City Dep't of Educ.*, 99 A.D.3d 606, 607, 953

N.Y.S.2d 31, 32 (1st Dep't 2012) (teacher's negligent supervision claims accrued on the date of the last alleged harassing act).

**13.** Because the Court holds that plaintiffs' § 1983 claim did not accrue until they were released from Leekin's custody, i.e., the statute had not run by the time this action was filed, no question is presented as to whether the federal doctrine of equitable tolling would toll the statute of limitations based on these facts.

(5th ed. 2011) ("The equitable tolling doctrine has no precise New York counterpart."). New York does recognize the somewhat analogous doctrine of equitable estoppel, under which a defendant may be estopped from asserting the statute of limitations as a defense, but that rule applies only "where it is the defendant's affirmative wrongdoing which produced the ... delay between the accrual of the cause of action and the institution of the legal proceeding." *Zumpano v. Quinn,* 6 N.Y.3d 666, 673, 816 N.Y.S.2d 703, 849 N.E.2d 926, 929 (2006) (alteration omitted) (quoting *General Stencils v. Chiappa,* 18 N.Y.2d 125, 128, 272 N.Y.S.2d 337, 219 N.E.2d 169 (1966)). Although it could be said that the agency defendants' wrongful conduct ultimately resulted in plaintiffs' inability to bring their claims upon accrual, because their conduct led to plaintiffs' confinement by Leekin, which led to the delay in filing suit, equitable estoppel requires a more direct connection between a defendant's obstructive conduct and the plaintiff's inability to timely file, such as a showing that the "plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v. Saeli,* 44 N.Y.2d 442, 448–49, 406 N.Y.S.2d 259, 377 N.E.2d 713, 716 (1978); *see also Corsello v. Verizon New York, Inc.,* 18 N.Y.3d 777, 789, 944 N.Y.S.2d 732, 967 N.E.2d 1177, 1184 (2012) (equitable estoppel not appropriate because "[p]laintiffs here have not alleged an act of deception ... on which an equitable estoppel could be based."). The agency defendants are not alleged to have deceived or misled plaintiffs regarding timely filing of their claims, and thus equitable estoppel is not available.

All else failing, a specific additional pitch is made that J.B., alone, is eligible for tolling on insanity grounds under CPLR 208, which provides, in relevant part, that

> [i]f a person entitled to commence an action is under a disability because of ... insanity at the time the cause of action accrues, ... the time within which the action must be commenced shall be extended to three years after the disability ceases .... The time within which the action must be commenced shall not be extended by this provision beyond ten years after the cause of action accrues."

CPLR § 208. Thus, for insanity, as opposed to infancy, CPLR § 208 only tolls the statute of limitations for a maximum of ten years from accrual of the otherwise time-barred claim. J.B.'s negligence claim accrued when he was adopted by Leekin, under the alias "Michelle Wells," on June 7, 1994, so at the latest, his claim was tolled pursuant to the insanity relief of § 208 until June 7, 2004. This is actually an earlier bar date than the one that arises under the separate and non-cumulative infancy toll—May 18, 2008, three years after J.B.'s 18th birthday.[14] Accordingly, even if J.B. was entitled to invoke the insanity toll, it would provide him no benefit. Under either measure, consequently, J.B.'s claim is untimely.

In sum, J.B., S.B., and S.W.'s negligence claims are barred by the statute of limitations, and they are dismissed.

## II. *Section 1983 Claims*

The agency defendants also move substantively for summary judgment

---

**14.** The insanity toll cannot be added on to the end of the infancy toll. Effectively, the two tolls run concurrently, not consecutively. *See John Doe No. 6,* 21 Misc.3d at 449, 863 N.Y.S.2d 891 (noting that because of this,

"[t]here will be cases where the insanity toll provides no real benefit to the infant, as where the three-year statute applies to a claim that accrues before the infant's 11th birthday.").

on the § 1983 claim. To establish a § 1983 claim, a plaintiff must demonstrate "that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d Cir.1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875–76 (2d Cir.1994)). The Second Circuit has held that, "[w]hen individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the constitution." *Doe v. New York City Dep't of Social Services*, 649 F.2d 134, 141 (2d Cir. 1981). "In particular, 'children in foster care [have] a substantive due process right [under the Fourteenth Amendment] to protection from harm.'" *Tylena M. v. Heartshare Children's Servs.*, 390 F.Supp.2d 296, 302 (S.D.N.Y.2005) (quoting *Marisol A. by Forbes v. Giuliani*, 929 F.Supp. 662, 675 (S.D.N.Y.1996)); *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 n. 9, 109 S.Ct. 998, 103 L.Ed.2d 249 (citing *Doe* and noting, without reaching the issue, that a state "may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents.").

■ Two requirements must be satisfied in order for a state actor to be held liable for failing to protect a child in its custody. First, the alleged acts and omissions "must have been a substantial factor leading to the denial" of the constitutional right. *Doe*, 649 F.2d at 141. Second, "the officials in charge of the agency being sued must have displayed a mental state of 'de-

liberate indifference.'" *Id.* (quoting *Turpin v. Mailet*, 579 F.2d 152, 166 (2d Cir. 1978)). The agency defendants argue that they are entitled to summary judgment on plaintiffs' § 1983 claims because plaintiffs cannot demonstrate (1) that they acted "under color of state law" in placing plaintiffs with Leekin; (2) that they demonstrated "deliberate indifference;" (3) that their conduct was a "substantial factor" leading to the harm plaintiffs suffered; and, in any case, (4) because the *Rooker–Feldman* doctrine deprives the Court of subject matter jurisdiction.

### A. State Action Requirement

■ The agency defendants first argue *de rigueur* that, as private foster care agencies, they are not "state actors," and, as a consequence, plaintiffs cannot establish the "under color of state law" element of their claim.[15] While it is true that the agency defendants are private entities, the Second Circuit has set out the three situations in which "the actions of a nominally private entity are attributable to the state":

(1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir.2008) (citing *Brentwood Acad. v. Tenn. Second-*

---

**15.** "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

*ary Sch. Athletic Ass'n,* 531 U.S. 288, 296, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001)).

In *Perez v. Sugarman,* the Second Circuit determined that private childcare agencies perform the "public function" of "accepting and retaining custody of children alleged to have been 'neglected' or 'abandoned,'" and thus that they are "state actors" for purposes of § 1983 claims. *Perez v. Sugarman,* 499 F.2d 761, 765 (2d Cir.1974); *see also Duchesne v. Sugarman,* 566 F.2d 817, 822 (2d Cir.1977) (reaffirming this decision in light of the intervening Supreme Court opinion in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)). The Second Circuit came to this conclusion based in part on New York's Social Services Law ("SSL"), which, according to the court, makes clear that "it is the State which in effect is providing the care through the private institutions."[16] *Id.* Courts in this circuit continue to apply this rule. *See, e.g., J.R. ex rel. Blanchard v. City of New York,* No. 11–cv–841, 2012 WL 4511442 (E.D.N.Y. Sept. 28, 2012); *Vega v. Fox,* 457 F.Supp.2d 172, 182 (S.D.N.Y.2006) ("It is now well established in this circuit that private child-care institutions authorized by New York's Social Services Law to care for neglected children are acting 'under color of state law' for purposes of section 1983.") (collecting cases); *Phillips ex rel. Green v. City of New York,* 453 F.Supp.2d 690, 737 (S.D.N.Y.2006) ("In the case of private child care agencies, courts in this Circuit have consistently held that they act under color of state law for § 1983 purposes . . . .").

The agency defendants do not deny the existence of this longstanding precedent. Rather, they argue that *Perez* is no longer good law and should not be applied here. In particular, they argue that current jurisprudence has narrowed the applicability of the "public function" test, undermining *Perez's* holding that private childcare agencies perform a "public function" of the state. In so arguing, the agency defendants rely heavily on a recent decision in this district that questioned the continuing viability of Second Circuit precedent designating private foster care agencies as state actors. *See Phelan ex rel. Phelan v. Torres,* 843 F.Supp.2d 259, 268 (E.D.N.Y.2011) ("[T]he Supreme Court has so dramatically changed the legal landscape in this area that [*Perez* and *Duchesne*] are arguably no longer good law."); *see id.* at 268–72 (expressing doubt as to whether the foster placement role is *"exclusively reserved* to the state, as is now required of a public function under the Supreme Court's current jurisprudence.") (emphasis in original). Ultimately, however, the court in *Phelan* determined that it was bound to treat the foster agency defendant as a state actor, "until the Second Circuit holds otherwise." *Id.* at 274. The Second Circuit affirmed, noting that it, too, would assume without deciding that the foster care agency defendant was a state actor. *Phelan ex rel. Phelan v. Mullane,* 512 Fed.Appx. 88, 90 (2d Cir.2013). Without expressing any opinion on the *Phelan* court's misgivings as to the validity of *Perez,* this Court agrees with its result: until the Second Circuit holds otherwise, the law in this

---

**16.** The Second Circuit also separately determined that such agencies were state actors in light of the "degree to which the State has insinuated itself into the actions of the private defendants here," as evidenced by the SSL. *Id.* at 765. Thus, while the *Perez* court did not express itself in terms of the three tests set out above, it clearly held that private childcare agencies are state actors under the "public function" test, and appeared to also take the view as well that such agencies' functions are "entwined" with state policies in a way that might satisfy the "close nexus" test.

circuit is that private foster care agencies, including the agency defendants here, are state actors.[17]

### B. *Deliberate Indifference*

 The agency defendants alternatively seek summary judgment on plaintiffs' § 1983 claim on the ground that plaintiffs cannot demonstrate that the agencies acted with "deliberate indifference" in placing plaintiffs with Leekin. As the Second Circuit held in *Doe*,[18] a private foster care agency, acting under color of state law, can be held liable for harm to a child by a foster parent under § 1983 if it was "deliberately indifferent to plaintiff's welfare," meaning that "its top supervisory personnel ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiffs deprivation of rights under the Constitution." *Doe*, 649 F.2d at 145. "An indifference is deliberate when a policymaker 'made a deliberate choice ... from among various alternatives.'" *Richards v. City of New York*, 433 F.Supp.2d 404, 424 (S.D.N.Y.2006) (quoting *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992)). "However, deliberate indifference does not require 'ill-will or the affirmative acquiescence in mistreatment'" *Richards*,

433 F.Supp.2d at 424 (quoting *Doe*, 649 F.2d at 144).

 Nonetheless, "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Ordinary negligence by itself cannot constitute deliberate indifference, but "gross negligent conduct creates a strong presumption of deliberate indifference." *Doe*, at 143; *see also id.* at 142 ("repeated acts of negligence could be evidence of indifference."); *Phillips*, 453 F.Supp.2d at 739 ("The Second Circuit has "often equated gross negligence with recklessness, and [has] defined it as the 'kind of conduct ... where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.'"") (quoting *Poe v. Leonard*, 282 F.3d 123, 140 n. 14 (2d Cir.2002)). The pertinent question, then, is whether plaintiffs have demonstrated a disputed issue of material fact as to whether each of the agency defendants was at least grossly negligent with regard to "a known injury, a known risk, or a specific duty," in placing plaintiffs in the charge of Leekin.[19]

---

17. For similar reasons, the Court finds reliance on *Lynn ex rel. Julie B. v. St. Anne Inst.*, 03–cv–1333, 2006 WL 516796 (N.D.N.Y. Mar. 2, 2006) unavailing. The Court notes that *Lynn* held that *Perez* is no longer good law relying largely on *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). *Lynn*, 2006 WL 516796, at *13. Under *Jackson*, a function is only "public" if it is "traditionally the exclusive prerogative of the State." *Jackson*, 419 U.S. at 353, 95 S.Ct. 449. But the Second Circuit in *Duchesne* specifically considered the *Perez* holding that foster agencies perform a "public function" in light of *Jackson*, and reaffirmed it. *See Duchesne*, 566 F.2d at 822, n. 4.

18. *Doe* is "the leading Second Circuit case dealing with section 1983 claims against a city for failing to protect foster children from abuse." *J.R. ex rel. Blanchard v. City of New York*, No. 11–cv–841, 2012 WL 4511442, at n. 4 (E.D.N.Y. Sept. 28, 2012).

19. Like a municipality, a private institution can only be held liable under § 1983 if the constitutional violation of which a plaintiff complains resulted from an official custom, policy, practice, or usage of the institution. *Mejia v. City of New York*, 119 F.Supp.2d 232, 275 (E.D.N.Y.2000) (citing *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). *Doe* ap-

Plaintiffs argue that they have raised a triable issue of fact as to defendants' deliberate indifference to both a known risk and a specific duty. As to a known risk, plaintiffs present testimony from agency supervisors—who were at least in part responsible for plaintiffs' placements—that they understood that poor foster parent screening would pose a risk to the safety of children placed in foster care. (*See* Pl.'s Opp. at 14 (citing Conway Dep. of Aug. 18, 2010)); *id.* at 23 (citing Smith–Nijiri Dep. of August 19, 2010); *id.* at 28 (citing Odom Dep. of Sept. 23, 2010 and May 20, 2010.) It has been held in this district that a foster care agency's policies and customs that, among other things, "inadequately governed the investigation, certification, and selection of foster parents ... could constitute deliberate indifference ... to the increased risk such policies would pose that foster children would be abused in their foster homes." *J.R. ex rel. Blanchard v. City of New York*, No. 11–cv–841, 2012 WL 4511442, at *8 (E.D.N.Y. Sept. 28, 2012) (deciding a motion to dismiss). This is the precise risk that plaintiffs claim the record shows existed here and allege that the agency defendants disregarded.

 As to the agency defendants' deliberate indifference to a specific duty, Plaintiffs argue that this can be inferred from their violation of a series of statutes and regulations governing the investigation of potential foster parents. The Court can "infer[ ] deliberate unconcern for [plaintiffs'] welfare from a pattern of omissions revealing deliberate inattention to specific duties imposed for the purpose of safeguarding plaintiffs from abuse." *Doe*, 649 F.2d at 145; *see also id.* (Defendants can be " 'charged with knowledge' of unconstitutional conditions when they persistently violated a statutory duty to inquire about such conditions and to be responsible for them."). Whether deliberate indifference can be inferred from breach of a statutory duty in part depends on the nature of the statute. "The more a statute or regulation clearly mandates a specific course of conduct, the more it furnishes a plausible basis for inferring deliberate indifference from a failure to act, even without any specific knowledge of harm or risk." *Id.* at 145–46 (finding triable issue of fact as to deliberate indifference based on foster agency's failure to report suspected child abuse in violation of SSL § 413); *cf. Phillips*, 453 F.Supp.2d at 740 (deliberate indifference could not be found based on agency's failure to comply with "a contract describing duties and responsibilities undertaken by the foster parents," rather than the agency.).

___

pears to hold that in the foster care context, this standard is met if an agency's top supervisory personnel exhibit "deliberate indifference" to a known injury, a known risk, or a specific duty. *Doe*, 649 F.2d at 145. Municipal liability can also be satisfied by demonstrating "a municipality's 'custom' of failing to train or supervise its employees." *Park v. City of New York*, No. 99–cv–2981, 2003 WL 133232 (S.D.N.Y. Jan. 16, 2003). *Doe* formulated the foster child's "failure to supervise" claim as the failure by the agency to supervise the *foster placement*, rather than its employees. *Doe*, 649 F.2d at 137. Other courts in this circuit have embraced this formulation in cases involving allegations by foster children against foster care agencies. *See J.R.*, 2012

WL 4511442, at *7, n. 4; *Richards*, 433 F.Supp.2d at 424–25; *Tylena M.*, 390 F.Supp.2d at 303, n. 3. Here, in addition to alleging deliberate indifference by the agency defendants' top supervisory officials, plaintiffs allege that the agency defendants maintained customs or practices of improperly investigating and certifying prospective foster and adoptive parents, and improperly caring for and monitoring children in their care. They further claim that the agency defendants failed to properly supervise plaintiffs' foster care placements. Under the approach set out in *Doe*, plaintiffs can seek to establish the agency defendants' liability under these theories.

In pursuit of this theory, plaintiffs cite several laws and regulations, in force at the time they were placed in foster care and/or adopted, governing the screening and monitoring of foster care and adoption placements. For example, state law required a foster agency to obtain, before certifying a foster parent, the applicant's employment history and personal and employment references, among other things, and instructed that "not until all inquiries are completed and evaluated shall the agency cause such certificate to be issued." SSL § 376(1) (1992). State regulations required obtaining similar information, including four non-relative references, 18 NYCRR § 443.3(a)(10)(iii) (1988), and directed the foster agency to conduct a "careful investigation" of the foster parent application before issuing a license or certificate to an applicant, § 444.3(e) (1981), as well as "review and evaluate" the background information provided by the applicant, § 443.3(a)(10) (1988), and conduct in-person interviews with at least two references, § 443.3(f)(1) (1988), among other things. Annual renewal investigations were required to include a home visit and written evaluation. 18 NYCRR 444.6(a) (1981). Prior to approving an applicant to adopt a child, an agency was required to conduct a home inspection, and collect three references, at least two of which could not be relatives, and employment verification, such as W–2s or pay stubs, among other things. 18 NYCRR 421.15(a)-(c) (1983).

To demonstrate deliberate indifference of the agency defendants to these statutes and regulations, and to the known risk inherent in failing to properly screen an applicant, plaintiffs set forth a passel of specific failings by the agency defendants in connection with approving Leekin as a foster and adoptive parent. Among other things, plaintiffs assert that each of the three agencies failed to verify Leekin's identity by not requesting photo identification from her, and failed to verify the Social Security numbers Leekin gave them, or in some cases even ask for a Social Security number at all.[20] Plaintiffs also point out that the agency defendants failed to ensure that Leekin provide the number of references required by state regulation, and failed likewise to conduct the required in-person interviews with the references she did provide. During obligatory home inspections, the agency defendants' records indicate that their employees did not inspect the basement, where Leekin hid plaintiffs, and failed to verify whether the off-limits space was truly being rented by a third party. Plaintiffs also allege that HHS and SCO failed to monthly visit the plaintiffs they placed, and when they did visit, failed to speak with them privately outside of Leekin's presence. (See Pl.'s Opp. at 35, n. 29). These failings, plaintiffs assert, along with others, occurred not only when the children were initially placed with Leekin, but also each time she was annually recertified as a foster parent, and again when she was approved to adopt each child. Plaintiffs further highlight numerous discrepancies within the documentation that Leekin provided to each of the agency defendants and within their own investigations of Leekin. See supra at 8. The failure to identify these discrepancies, plaintiffs press, is more evidence of defendants' deliberate indifference in assessing Leekin's suitability as a parent. Additionally, plaintiffs argue that SJSC's placement of five special-needs children with "Michelle Wells," who claimed to be a single woman working full-time, is itself evidence of deliberate indifference.

**20.** *See supra* note 8.

Plaintiffs point out as well that the adoption home studies for each of the plaintiffs, reflecting much of the noncompliant conduct, were signed by top supervisory personnel at the agency defendants, and cite to testimony that plaintiffs' case files were reviewed by supervisors. (*See* Pl.'s Opp. at 22 (SJSC); *id.* at 27(HHS); *id.* at 29–30(SCO)). They further identify evidence that the failure to investigate Leekin's identity, collect the proper number of references, and the failure to interview references were not just isolated missteps by employees, but representative of the policies and procedures in place at each agency. *See, e.g.,* Smith–Nijiri Decl. ¶ 39 (stating that HHS required two, not four, personal references from an applicant); Odom Decl. ¶ 24 (stating that SCO policy was to call references, as opposed to interview them in person); Conway Decl. ¶ 31 (declaring that no set number of personal references was required by law at the time SJSC placed plaintiffs with Leekin, a claim that is contradicted by the relevant regulations).

 While not all of the failures that plaintiffs raise would necessarily amount to gross negligence individually—and some may not have been negligent at all—taken together, they unquestionably present disputed issues of fact as to whether the agency defendants engaged in "repeated acts of negligence" sufficient to constitute deliberate indifference. Contrary to the defendants' argument, the alleged acts and omissions go well beyond mere "bureaucratic inaction," and demonstrate failure to comply with specific laws and policies designed to protect foster children and to take other reasonable precautions, in a way that provides a "plausible basis for inferring deliberate indifference from a

failure to act." *Doe,* 649 F.2d at 145–46. The agency defendants respond with evidence that Leekin consistently presented as an excellent parent, provided them with fake references, W–2s, and Social Security cards that would have fooled any reasonable investigator, and also provide testimony that their policies and practices were reasonable for the era. And, it may be so. This is a classic disputed issue of fact. *See, e.g., Ingrao v. Cnty. of Albany, N.Y.,* No. 01–cv–730, 2006 WL 2827856, at *10 (N.D.N.Y. Oct. 2, 2006) ("Because a reasonable jury might conclude that the conglomeration of these instances evince a pattern, practice, or custom of deliberate indifference to [plaintiff's] rights, Defendant's motion for summary judgment must be denied.").

Additionally, it is worth noting that much of plaintiffs' argument assumes that when a particular procedure or occurrence—such as a home visit—is not reflected in the agency defendants' records, it did not take place. In this context, the absence from the agency defendants' voluminous records of any evidence of the procedures in question being completed is sufficient to demonstrate disputed issues of fact as to whether they ever were completed. The agency defendants may ultimately present evidence that these deficiencies in their records resulted not from the failure to actually take the necessary steps, but rather from a failure to properly record the steps taken, or to retain the relevant records in the intervening decades. Whether that is the case, and whether plaintiffs can demonstrate that, on balance, the agency defendants' failures amounted to deliberate indifference, is an issue for the fact finder.[21]

---

**21.** The agency defendants correctly point out that each agency is a separate legal entity, and that each of the plaintiffs interacted with

at most only one of them. The Court finds that plaintiffs have raised issues of fact as to each agency's deliberate indifference, and, of

## C. *Causation*

■ To survive summary judgment, plaintiffs also must demonstrate that there is a genuine dispute concerning whether the agency defendants' deliberate indifference was "a substantial factor leading to the denial" of their right to be protected from harm while in foster care. *Doe*, 649 F.2d at 141 (citing *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)); *see id.* at 145 (formulating the requirement as one of proximate causation). For deliberate indifference to be a substantial factor in the violation of a constitutional right under § 1983, the policy at issue must be "closely related to the ultimate injury," and it must appear that the injury could have been avoided had the policy not been "deficient in the identified respect." *Richards*, 433 F.Supp.2d at 426.

■ The agency defendants seek summary judgment on this issue, on the ground that plaintiffs' theory is too hypothetical to demonstrate that the agency defendants proximately caused their injuries. The agency defendants argue that it is impossible to determine, on the record before the Court, whether the agency defendants ever followed up on the claimed inconsistencies with Leekin; and that Leekin, a successful con artist, would most likely have been able to easily correct or deal with such inconsistencies if they had. But these propositions, even putting aside their own essential speculativeness and assuming the existence of admissible evidence establishing their truth, do not demonstrate the absence of any issue of fact as to causation; indeed, they actually pose disputes as to issues of material fact, and are thus insufficient to carry the agency defendants' burden on summary judgment. *See Jeffreys*, 426 F.3d at 553.

■ The agency defendants also protest that Leekin's extensive fraud was an intervening force "so bizarre, unique and unforeseeable" that it broke the causal chain needed to impose liability on the agency defendants. (Def.'s Mem. at 45.) Under New York law, "[w]here the acts of a third person intervene between the defendant's conduct and the plaintiffs injury, . . . liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence." *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 414 N.E.2d 666, 670 (1980). "Because questions concerning what is foreseeable and what is normal may be the subject of varying inferences, . . . these issues generally are for the fact finder to resolve." *Id.* That is the case here. Whether it is foreseeable that plaintiffs would have been harmed by Leekin, after being placed her care without proper screening and investigation—if plaintiffs can prove that the screening here was grossly negligent—is an issue for the fact finder. Again, the agency defendants fail to demonstrate the absence of a dispute of fact.

To be clear, the burden does not shift to plaintiffs to demonstrate a disputed issue of fact as to causation. They do so anyway. Specifically, plaintiffs offer that causation exists because if the agency defendants had verified Leekin's self-reported information as required, they would have uncovered her lies, and, presumably, would never have placed plaintiffs with her. They proffer evidence that the agency defendants, pursuant to their own policies and testimony, would not have placed foster children with an applicant who had provided them with false information as to her identity. (*See* Pl.'s Opp. at 35–36.)

course, each plaintiff will have the burden of "connecting the dots" between his or her

individual claim and the specific agency with which he or she interacted.

Assuming for causation purposes that plaintiffs have established the agency defendants' deliberate indifference, plaintiffs successfully demonstrate an issue of fact as to whether that indifference was a substantial factor leading to the abuse they suffered at the hands of Leekin. *See Doe,* 649 F.2d at 144 ("the causal link between the agency's alleged failure to supervise and the continuation of [plaintiff's] abuse is clear," because if the agency had investigated "with sufficient acuity and diligence to discover the abuse, it would have been able to prevent further abuse by withdrawing her from the home."); *J.R.,* No. 11–cv–841, 2012 WL 4511442, at *8 (At least at the motion to dismiss stage, policies that, among other things, "inadequately governed the investigation, certification, and selection of foster parents for particular foster children" could be "a 'substantial factor leading to the denial' of [a child's] right to be protected from harm while in foster care.").

### D. *Rooker–Feldman*

 The agency defendants next argue that the *Rooker–Feldman* doctrine divests this Court of subject matter jurisdiction over plaintiffs' § 1983 claim, because the claim is based on events that took place after they were adopted by Leekin. Under the *Rooker–Feldman* doctrine, "federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments." *Hoblock v. Albany Cnty. Bd. of Elections,* 422 F.3d 77, 84 (2d Cir.2005).

[T]here are four requirements for the application of *Rooker–Feldman.* First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[ ] of injuries caused by [a] state-court judgment[.]" Third, the plaintiff must "invit[e] district court review and rejection of [that] judgment[ ]." Fourth, the state-court judgment must

have been "rendered before the district court proceedings commenced...."

*Id.* at 85 (2d Cir.2005) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005)) (footnote omitted). In *Exxon Mobil,* the Supreme Court unanimously narrowed the *Rooker–Feldman* doctrine in response to what it saw as overly broad applications by the circuit courts, and set out the four requirements above. *Exxon Mobil,* 544 U.S. at 284, 125 S.Ct. 1517.

 The *Rooker–Feldman* argument advanced by the agency defendants rests on the New York Family Court and Surrogate's Court decrees finalizing plaintiffs' adoptions by Leekin. They argue that any of plaintiffs' claims arising out of the post-adoption period necessarily invite this Court to review and invalidate those adoption decrees. In what could generously be called an overreach, the agency defendants then argue that *Rooker–Feldman* bars this Court's review of plaintiffs' § 1983 claim in its entirety, because the injury for which plaintiffs seek relief is, in part, their post-adoption abuse.

The agency defendants purport to rely for this argument on the Seventh Circuit's decision in *Lewis v. Anderson,* 308 F.3d 768 (7th Cir.2002), a case in which individuals sued officials of the Wisconsin Department of Health and Human Services ("WDHHS") under § 1983 for improperly placing them with foster parents who abused them. Invoking *Rooker–Feldman,* the Seventh Circuit in *Lewis* stated that "[t]o the extent that the plaintiffs in this case contend that their constitutional rights were violated by the defendants during the pre-adoption period, they may proceed; to the extent that they challenge the decision to approve the Lewises as adoptive parents, they may not (as the latter decision was taken under the supervision of the state courts)." *Lewis,* 308

F.3d at 772. Although it is not clear whether the Seventh Circuit intended to suggest that the decision by WDHHS to approve the adoptive parents—as opposed to a judicial ruling by a state court—would be given preclusive effect under *Rooker–Feldman*, that would almost certainly not survive the Supreme Court's subsequent decision in *Exxon Mobil*.[22] In any event, the *Lewis* court ultimately held that *Rooker–Feldman* did not bar plaintiffs' claims, because those claims arose out of WDHHS's selection of the foster parents and monitoring of "their performance in that capacity prior to the adoption," which "was not taken pursuant to any court order." *Id.* (concluding that, accordingly, "the § 1983 suit cannot be the equivalent of an attempt to have a lower federal court review a state court judgment.").

The parallel, for sure, is strong. As in *Lewis*, the allegations in the complaint focus on the agency defendants' selection and approval of Leekin as a foster parent, the monitoring of plaintiffs prior to their adoptions, and other pre-adoption procedures. Thus, even applying *Lewis*, plaintiffs' claims would not be barred by *Rooker–Feldman*. Moreover, to the extent that plaintiffs' claims do arise out of incidents that took place post-adoption, *Rooker–Feldman* still does not bar jurisdiction in this action, because plaintiffs' claims do not meet at least two of the *Rooker–Feldman* requirements: plaintiffs did not lose in state court and they do not "invite district court review and rejection" of a state court judgment. *Green v. Mattingly*, 585 F.3d 97, 102 (2d Cir.2009) (quoting *Hoblock*, 422 F.3d at 85).

▮▮▮▮ In delineating the meaning of the Supreme Court's decision in *Exxon Mobil*, the Second Circuit has made clear that the "core requirement" of *Rooker–*

*Feldman* is that "federal plaintiffs are not subject to the *Rooker–Feldman* bar unless they *complain of an injury* caused by a state judgment." *Hoblock*, 422 F.3d at 87 (emphasis in original). The requisite causal connection between the state court judgment and the source of the injury may be satisfied under two circumstances: "(1) where ... the state court judgment itself rather than some action by the defendant in the prior state court litigation is the source or cause of the injury the federal plaintiff complains about in the federal suit, or (2) where ... the underlying harmful action the federal plaintiff complains about was actually taken by a third party in compliance with an order embodied in a judgment rendered by a state court" *Glatzer v. Barone*, 614 F.Supp.2d 450, 463–64 (S.D.N.Y.2009) *aff'd*, 394 Fed.Appx. 763 (2d Cir.2010). Either way, the causation must be direct. "[A] plaintiff who seeks in federal court a result opposed to the one he achieved in state court does not, for that reason alone, run afoul of *Rooker–Feldman*." *Id.* Indeed, even if the claimed injury has been previously presented to a state court, "[t]he fact that the state court chose not to remedy the injury does not transform the subsequent federal suit on the same matter into an appeal, forbidden by *Rooker–Feldman*, of the state-court judgment," although the subsequent federal suit could, of course, be barred by ordinary preclusion principles. *Id.* at 87–88.

Under this reasoning, the injuries alleged in the complaint were not "caused" by a state-court judgment. Plaintiffs do not complain that their injuries were brought about directly by the state court decrees finalizing their adoptions, but rather by the agency defendants' pre-adoption conduct in making the foster placements and supporting those adoptions; nor do they base their claims on conduct the

---

**22.** Regardless, the Seventh Circuit's decision would not be binding on this Court.

agency defendants took in compliance with such decrees. Plaintiffs' claims do not "invite district court review and rejection of" any state court judgment, and they "plainly ha[ve] not repaired to federal court to undo the [Family Court] judgment." *Exxon Mobil,* 544 U.S. at 293, 125 S.Ct. 1517.

Additionally, plaintiffs are not "state court losers" by virtue of having had their adoptions finalized in the state courts. Even if the agency defendants could be considered prevailing parties in plaintiffs' adoption proceedings, which is not at all clear, a Florida court has already declared at least three of the adoptions to be void *ab initio,* under New York law, on account of Leekin's misrepresentations to the New York Family Court regarding her identity. (*See* Kapell Decl. Ex. 9 at PLF00849–851 (Order for Adjudication of Dependency, *In the interest of: [R.W., T.W., and J.G.],* Fl. Cir. Ct. 19th Cir. (Sept. 15, 2008).)) Thus, to the extent plaintiffs were "state court losers" following their adoption proceedings, the Florida proceeding has since converted them to "state court winners." *See Green,* 585 F.3d at 102 (2d Cir.2009) (Reversing a dismissal on *Rooker–Feldman* grounds on the basis that, "[b]ecause the Family Court issued a superseding order [in a second proceeding] returning plaintiff's child to her, and because the Family Court proceedings were ultimately dismissed, we conclude that plaintiff was not a 'state-court loser[ ].'"). For these reasons, in sum, *Rooker–Feldman* does not bar plaintiffs' claims.

### E. *The City–Placed Plaintiffs*

Two of the ten plaintiffs—L.J. and J.G.—were placed in foster care by the City, rather than by any of the agency defendants. The agency defendants argue that they cannot be held liable to these two plaintiffs under § 1983. In this regard, the agency defendants are correct.

 In general, "a State's failure to protect an individual against private violence," such as Leekin's abuse of the plaintiffs, "simply does not constitute a violation of the Due Process Clause," and thus cannot form the basis of a § 1983 claim. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (holding that state had had no duty under the Due Process Clause to protect a child against beatings by his father even though the state had received reports that the father physically abused the child). There are two exceptions to this broad rule. A § 1983 action may arise out of a private harm if: "(1) the victim of private conduct was in a 'special relationship' with the State or (2) the state or its agents 'in some way assisted in creating or increasing the danger to the victim.'" *Campbell v. Brentwood Union Free Sch. Dist.,* 904 F.Supp.2d 275, 280 (E.D.N.Y.2012) (quoting *Matican v. City of New York,* 524 F.3d 151, 155 (2d Cir. 2008)).

 As the agency defendants acknowledge, the "special relationship" required for the first exception may exist between the state and a child when a state official places the child in foster care. *See, e.g., Doe ex rel. Johnson v. S. Carolina Dep't of Soc. Servs.,* 597 F.3d 163, 172–73 (4th Cir.2010); *Doe,* 649 F.2d at 141 (pre-*DeShaney*). However, it is undisputed that the agency defendants did not place L.J. or J.G. in foster care. Accordingly, L.J. and J.G. cannot assert a § 1983 claim against the agency defendants based on the "special relationship" exception. L.J. and J.G. argue, nonetheless, that they can assert a § 1983 claim against the agency defendants based on the "state-created danger" exception.

 Under this exception, "state actors may be liable under section 1983 if they affirmatively created or enhanced the

danger of private violence." *Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 427–28 (2d Cir.2009) (citing *Dwares v. City of New York,* 985 F.2d 94, 99 (2d Cir.1993)). The state actor must have engaged in "affirmative" conduct that actively facilitated the danger to the plaintiff; "passive failure to stop private violence" will not suffice to establish a state-create danger. *Pena v. DePrisco,* 432 F.3d 98, 109 (2d Cir.2005) (" 'state created danger' liability arises from the relationship between the state and the private assailant."); *see also Lombardi v. Whitman,* 485 F.3d 73, 79 (2d Cir.2007) ("It is not enough to allege that a government actor failed to protect an individual from a known danger of bodily harm or failed to warn the individual of that danger.").

The Second Circuit has recognized that "[d]istinguishing between 'active' and 'passive' facilitation can of course sometimes be difficult," *id.* at 110, and a review of relevant cases demonstrates how fine the line can be. *See Dwares,* 985 F.2d at 99 (state-created danger existed where police officers explicitly told assailants they would not interfere with an attack and thus gave "prearranged official sanction" to the private violence); *Matican v. City of New York,* 524 F.3d 151, 157–58 (2d Cir. 2008) (police failure to inform confidential informant of a suspect's violent criminal history or release on bail is too passive to constitute state-created danger; but sting operation planned in a manner that would lead the suspect to learn about the informant's involvement was sufficiently affirmative); *Okin,* 577 F.3d at 429–30 (state-created danger existed when police officers, in responding to plaintiffs complaints of domestic violence, "openly expressed camaraderie with [the assailant] and con-

tempt for [the plaintiff]" and expressed a "dismissive and indifferent attitude" toward her complaints.); *Pena,* 432 F.3d at 111 (state-created danger exists when "state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others."); *Hemphill v. Schott,* 141 F.3d 412, 419 (2d Cir.1998) (state-created danger where police officers gave a handgun to a retired officer who then shot a fleeing robber).

Plaintiffs argue that the conduct of the agency defendants falls on the "affirmative conduct" side of the line. By improperly screening Leekin as a foster and adoptive parent, continuing to place more and more special needs children in the Leekin home, and failing to discover plaintiffs L.J. and J.G. during any of their required visits to or inspections of the home, plaintiffs argue that the agency defendants increased the risk that L.J. and J.G. would be harmed by Leekin. Plaintiffs also appear to argue that by repeatedly demonstrating to Leekin that she would not be even minimally investigated, screened, or monitored, the agency defendants affirmatively communicated to her that she could abuse the children in her custody with impunity, thus increasing the risk of harm to all of the children she subsequently harmed.[23] Indeed, the *Pena* court indicated that "repeated inaction by government officials over a sustained period of time, without explicit advance approval or encouragement of the misbehavior in question, might effectively constitute an implicit 'prior assurance' rising to the level of an affirmative act." *Pena,* 432 F.3d at 110 (2d Cir.2005); *see also Okin,*

---

**23.** The Court notes that L.J. and J.G. were the second and third of the ten plaintiffs to be placed with Leekin.

577 F.3d at 429 ("affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence.").

Even so, precedent suggests that a more deliberate—though not explicit—communication to the private actor sanctioning her misconduct than the one plaintiffs allege here is required. Indeed, in finding that the defendants had encouraged the private violence against the plaintiff in *Pena,* the court there noted that "[s]ometimes *deliberate* silence is equivalent to explicit permission." *Id.* at 112 (emphasis added). Plaintiffs do not argue that the agency defendants intended by their incompetence to communicate to Leekin that she could abuse the children in her custody at will.[24] The agency defendants' failings in this case are closer to a "failure to prevent misbehavior," which is precisely what Second Circuit precedent cautions cannot constitute a state-created danger. *Pena,* 432 F.3d at 112; *see also Chambers v. N. Rockland Cent. Sch. Dist.,* 815 F.Supp.2d 753, 769 (S.D.N.Y.2011) ("At worst, [defendants'] actions were insufficient to prevent the danger, thus placing this case squarely in the ambit of *DeShaney.*").

The Court, accordingly, with no material facts in dispute, holds that the agency defendants' conduct did not create the danger to L.J. and J.G. from Leekin. Those two plaintiffs cannot maintain a § 1983 claim against the agency defendants, and the claim is dismissed as to them.

### III. *Negligence Claims*

■ Finally, the agency defendants seek summary judgment on plaintiffs' common law negligence claims.[25] "To establish a prima facie case of negligence, a plaintiff must establish the existence of a duty owed by a defendant to the plaintiff, a breach of that duty, and that such breach was a proximate cause of injury to the plaintiff." *Nappi v. Inc. Vill. of Lynbrook,* 19 A.D.3d 565, 566, 796 N.Y.S.2d 537 (2d Dep't 2005).

■ The agency defendants first argue that, as a matter of law, they did not act negligently—i.e., breach their duty of care to plaintiffs. In support of this argument, the agency defendants point to evidence that, in addition to deceiving them, Leekin duped numerous law enforcement and financial institutions over the years, whose employees had specialized training and experience in fraud detection. (*See* Def.'s 56.1 Stmt ¶ 34). This fact, the agency defendants plead, "defeats any claim that the foster care professionals here failed to exercise reasonable care in their oversight of plaintiffs' foster care or adoptions." (Def.'s Mem. at 44). In other words, the agency defendants claim that the fact that Leekin defrauded multiple institutions is conclusive proof that none of these entities were negligent in their interactions with her. Put another way, had they looked with 20/20 vision, they would not have seen Leekin's deficiencies. Far from a matter of law, of course, at most the agency defendants' argument raises an issue of fact as to whether Leekin's skill at deception prevented them—along with others—from discovering the truth, despite having exercised due care. Similarly unpersuasive, the agency defendants present reports

---

**24.** This has no bearing on the determination of whether the agency defendants acted with deliberate indifference, which does not require complicity in the violation. *See Richards,* 433 F.Supp.2d at 424 ("deliberate indifference does not require ill-will or the affirmative acquiescence in mistreatment.").

**25.** L.J. and J.G. do not assert negligence claims against any of the agency defendants.

from outside psychiatrists and other professionals that, based on evaluations of the plaintiffs and Leekin, determined that plaintiffs were benefitting and even improving in Leekin's custody, as evidence that they acted reasonably in placing and leaving plaintiffs with her. (*See, e.g.,* Def.'s 56.1 Statement ¶¶ 56–57, 79, 80, 84–86, 110). These reports are hardly conclusive as a matter of law; they form one piece of the conflicting evidence that the fact finder will have to weigh in determining whether the agency defendants breached their duty of care.

The agency defendants also seek judgment on the ground that plaintiffs cannot establish causation, relying on the same arguments they made regarding causation under § 1983. For the same reasons discussed earlier in connection with the § 1983 claim, plaintiffs have demonstrated the existence of a triable issue of fact as to causation, and judgment on this ground is denied.[26]

### Conclusion

For the foregoing reasons, J.B., S.B., and S.W.'s negligence claims are dismissed as untimely, and L.J. and J.G.'s § 1983 claims are dismissed. In all other respects, the motion is denied. Consequently, the § 1983 action continues with respect to plaintiffs S.W., T.G., J.L., S.B., R.E., J.B., C.B., and T.L., and the negligence action continues with respect to plaintiffs T.G., J.L., R.E., C.B., and T.L.

SO ORDERED.

---

**26.** Because the Court denies summary judgment on plaintiffs' § 1983 claim, the Court need not consider the agency defendants' request to decline to exercise supplemental jurisdiction over the negligence claims. (Defs.' Mem. at 43).